[Crim. No. 2712. In Bank.—March 20, 1925.]

## THE PEOPLE, Respondent, v. LEWIS PERRY, ED. MONTIJO, and TOM BAILEY, Appellants.

[1] CRIMINAL LAW—MURDER—IDENTIFICATION OF DEFENDANTS—SUFFICIENCY OF EVIDENCE.—In this prosecution for murder it is held that the positive identification made of the defendants by certain witnesses, considered in connection with other corroborating evidence, established the guilty participation of the three defendants in the commission of the crime charged against them, beyond a reasonable doubt.

[2] ID.—MOTION FOR SEPARATE TRIALS—WHEN NO MISCARRIAGE OF JUSTICE BY DENIAL OF.—In a prosecution for murder charged against three parties, no miscarriage of justice resulted, even if the order was erroneous, from the denial of a motion of two of the defendants for separate trials upon the ground that the third defendant had made a confession injurious to the moving parties, which would be introduced in evidence by the prosecution although not binding upon them, where one of the moving parties had made a confession which was practically demonstrative of his guilt and more damaging to him than the confession complained of, and the other defendant had been unmistakably identified as a participant in the crime, and with the confession complained of eliminated the evidence was amply sufficient to justify the conviction of all the defendants.

[3] ID.—SEPARATE TRIALS—DISCRETION OF COURT.—At common law a defendant jointly charged with crime with others was not, as a matter of right, entitled to a separate trial, and that is the rule under the code of this state at this time; nor does the fact that damaging evidence admissible against one, but not against the other, entitle the latter to a separate

---

2. See 8 R. C. L. 167; 8 Cal. Jur. 193.
4. See 8 R. C. L. 199; 8 Cal. Jur. 60.

trial, the matter being one for the sound discretion of the trial court.

[4] ID.—EVIDENCE—OTHER CRIME SHOWN BY—ADMISSIBILITY OF.—In a prosecution for murder, evidence offered to identify an automobile claimed to have been used in the commission of the murder is none the less admissible because it tends to connect the defendants with the theft of the automobile.

[5] ID.—OTHER OFFENSES—RULE.—The rule is that evidence tending to connect a defendant with the commission of a crime charged against him is not to be excluded on the ground that it tends to connect him with an offense not included in the charge.

[6] ID.—CONFESSION—PRELIMINARY PROOF—DISCRETION.—In a criminal prosecution, in determining the preliminary question as to whether a confession was freely and voluntarily made, the trial court is vested with a wide discretion and its ruling cannot be interfered with in the absence of a showing of abuse.

[7] ID.—MURDER COMMITTED IN ROBBERY—CONFEDERATES—LIABILITY OF EACH—INSTRUCTIONS.—If a homicide is committed by one of several confederates while engaged in an attempt to perpetrate the crime of robbery in furtherance of a common purpose, the person or persons so engaged, but who did not actually do the killing, are as accountable to the law as though their own hands had intentionally fired the fatal shot or given the fatal blow, and such killing is murder of the first degree. The jury has no option but to return a verdict of murder of the first degree whether the killing was intentionally or accidentally done, and it is proper to so instruct the jury.

[8] ID.—MENTAL UNSOUNDNESS—INSTRUCTIONS.—In a prosecution for murder, where evidence offered by the defense as to the mental status of one of the defendants furnished a basis for the contention that said defendant by reason of mental unsoundness, superinduced by injury, or caused by disease—acquired or transmitted—or brought about by the use of drugs, rendered him irresponsible and that he ought not to be required to suffer the penalties of the law, there was no error in the court's instructing the jury on the question of mental unsoundness.

[9] ID.—MENTAL RESPONSIBILITY—TEST.—The law does not substitute mental standardization in place of actual age as the sole test of responsibility for the commission of crime, but the test of accountability is whether the defendant knew the nature and quality of the act he was committing, and if so, whether

---

7. Homicide resulting from injuries by different persons acting independently, note, 67 L. R. A. 426.

Responsibility of one assisting in robbery during which his companion commits murder, note, 45 L. R. A. (N. S.) 55. See, also, 13 R. C. L. 729; 13 Cal. Jur. 600.

9. See 8 R. C. L. 64.

he knew it was an act forbidden and punishable by law and that it was wrong to commit it.

[10] ID. — PENALTY — DISCRETION OF JURY. — In a prosecution for murder it is the jury's right and duty to consider and weigh all the facts and circumstances attending the commission of the offense, and from these and such reasons as may appear to it upon a consideration of the whole situation, determine whether or not in the exercise of its discretion life imprisonment should be imposed rather than the death penalty.

[11] ID.—INSANITY—DEFINITION—INSTRUCTION.—In a prosecution for murder there is no error in instructing the jury in the language of section 21 of the Penal Code that all persons are of sound mind who are neither idiots nor lunatics nor affected with insanity.

[12] ID.—VERDICT—FORM.—In a prosecution for murder there is no merit in the contention that if the jury intended to impose the death penalty it should have been required to return a verdict expressly declaring such intent.

[13] ID.—AGE OF DEFENDANT—BURDEN OF PROOF.—In a prosecution for murder the burden is upon a defendant, under section 190 of the Penal Code, to prove that he was under the age of eighteen years at the time of the commission of the crime and therefore not subject to the death penalty, and it is held that the implied finding that one of the defendants in this case had not sustained this burden cannot be disturbed under the evidence.

(1) 30 C. J., p. 297, n. 27. (2) 16 C. J., p. 788, n. 9; 17 C. J., p. 231, n. 63, p. 368, n. 5. (3) 16 C. J., p. 785, n. 69, p. 787, n. 93. (4) 16 C. J., p. 600, n. 34. (5) 16 C. J., p. 600, n. 32. (6) 16 C. J., p. 735, n. 35; 17 C. J., p. 242, n. 51. (7) 29 C. J., p. 1074, n. 60, 66; 30 C. J., p. 403, n. 87. (8) 30 C. J., p. 359, n. 20. (9) 16 C. J., p. 99, n. 3, p. 100, n. 12. (10) 29 C. J., p. 1052, n. 64. (11) 30 C. J., p. 359, n. 23. (12) 30 C. J., p. 455, n. 77. (13) 31 C. J., p. 1096, n. 40.

APPEAL from a judgment of the Superior Court of Los Angeles County and from an order denying a new trial. Arthur Keetch, Judge. Affirmed.

The facts are stated in the opinion of the court.

Kirby, Holland & Kirby for Appellants.

U. S. Webb, Attorney-General, and Erwin W. Widney, Deputy Attorney-General, for Respondent.

12. See 13 Cal. Jur. 746.

SEAWELL, J.—The defendants were jointly accused by
the grand jury of the county of Los Angeles with the offense
of having, on February 20, 1924, in said county of Los An-
geles, murdered Glen E. Bond, a police officer of the city of
Los Angeles. They were thereafter jointly tried and con-
victed of said crime of murder as by the indictment charged,
the jury having returned a simple verdict against each
defendant of murder of the first degree. The court there-
upon pronounced the judgment which the law in such cases
prescribes, which is the death penalty. The appeal is from
the orders denying the motions for new trials made jointly
by Perry and Bailey and separately by defendant Montijo,
and from the judgments of conviction.

The defendants, all of whom are young men with blem-
ished records, and who were known by various false names,
preconceived on the day prior to the day on which the
murder occurred, and agreed upon a plan by which they
were to undertake to rob a branch of the Merchants Na-
tional Bank, situate on the corner of Seventh and Hoover
Streets, in said city of Los Angeles. The hour set by the
defendants for the commission of the crime was 12 o'clock,
meridian, February 20, 1924. Pursuant to their said agree-
ment and understanding, the defendants entered said bank
a few minutes before the appointed hour, armed with loaded
revolvers or pistols, with the clear intent and purpose of
executing their plan to rob said bank of its moneys and
valuable personal property by means of force and fear to
be exercised upon the officers and employees of said bank
and upon such other persons as should be present in said
bank. In accordance with the prearranged plan the de-
fendant Montijo, upon entering the bank, took a position
near the front entrance the better to guard the entrance to
the bank against such persons as might attempt to enter
during the robbery and to exercise surveillance over persons
occupying the front portion of the room. Defendants Perry
and Bailey, with drawn arms, made their way from the
front entrance to the central and to the rear portions of
said bank, commanding as they went the officers and em-
ployees of said bank and the two or three customers who
were transacting business therein, to hold up their hands,

and directing certain of the employees to occupy designated
positions and to maintain silence. The bank contained the
usual lobby for the use of the public. Certain floor space
therein was divided into teller's and clerk's cages and into
compartments for the private use of the patrons of the bank
and its officers. Two police officers, Glen E. Bond, the de-
ceased, and F. W. Forbes, members of the Los Angeles city
police department, who had previously been detailed as
guards at the bank, were seated in one of these compart-
ments. The door leading therein was partly open. The
police officers were taken by surprise as defendant Perry
came to the door of the compartment which they were occu-
pying and commanded them to remain quiet. He then
ordered Paul A. Terry, a bank clerk, and Assistant Mana-
ger George W. Thompson to enter the same compartment
occupied by the police officers. In the meantime, W. E.
Zimmerman, the manager of the bank, had been held at
bay at his desk by defendant Bailey, who held a pistol
leveled at his body. During the time that Perry was occu-
pied in conducting Terry and Thompson to their respective
stations, Officer Bond and Forbes had changed their posi-
tions, and Bond, at least, had drawn his pistol and was
standing in a crouching position near the door as Perry
returned conducting Terry and Thompson to the compart-
ment occupied by the police officers. Immediately upon
Perry appearing at the door three pistol shots rang out in
rapid succession. Whether Officer Bond or the defendant
Perry fired the first shot the witnesses were unable to state.
At any rate Bond fell mortally wounded from the fire of
Perry's pistol. Two bullets entered his body and he ex-
pired soon thereafter. Shortly after Bond had fallen mor-
tally wounded, Forbes, who had dropped to the floor and
was crawling out of the compartment through another door,
was struck on the head by a bullet which inflicted a scalp
wound. He was probably shot by Bailey. Several other shots
were fired by Perry and Bailey. They assumed crouching or
stooping positions and while making their way toward the
front exit, brandishing their revolvers in a menacing manner,
Officer Forbes, as he lay wounded upon the floor, fired a
shot at Perry and exclaimed as he shot, "I got him."
Montijo retreated from the bank a little ahead of the

other two defendants and all of the defendants made their escape from the building. They obtained nothing of value. A red Buick automobile, sport model, which will be hereafter referred to, played a part in the crime. Without doubt the defendants used this car, which had been stolen by them or by a fourth person who also appears to have been a confederate, for the purpose of making a reconnoitering survey of the bank and its surrounding locality preliminarily to the attempted robbery. This automobile was parked at a convenient place near the scene of the crime immediately prior to the attempted robbery. It was hurriedly driven away immediately after the attempted robbery but by a miscarriage of plans none of the defendants, possibly with the exception of Perry, were able to obtain passage in it. According to the confessions received in evidence, Oscar Perry, a brother of defendant Lewis Perry, was the driver of the car.

Dr. H. Gordon Bayliss, a physician and surgeon, was called by Oscar Perry to attend his brother, defendant Lewis Perry, for a gunshot wound, at 1 o'clock on the afternoon of the attempted robbery. This was but one hour following the shooting at the bank. The defendant was then at the Olive Inn, 337 Olive Street, suffering from a gunshot wound. He made no explanation to the physician as to how he came by his wounds. Oscar informed the physician that Lewis had accidentally shot himself. The bullet had passed through the defendant's body, piercing the right lung in its course. The surface wound upon the chest was larger than the wound in the back, which would indicate that the bullet entered the back and passed out through the chest-wall. The shot was probably fired by Forbes as Perry was retreating from the bank. Defendant Perry, his brother Oscar and perhaps one other of the defendants became suspicious that the physician would report the case to the police and the defendant Perry was removed from the Olive Inn to Oscar's home at 2025 E. Fourth Street. At 9 o'clock that evening defendant Lewis Perry was arrested and subsequently taken to the receiving hospital. He informed the officers that he had shot himself accidentally, in some sort of a scuffle. There were no indications of powder burns or other evidence that the shot had been fired at short range. Two loaded revolvers and cartridges

were taken from the premises occupied by defendant Perry. Articles of clothing which he had worn were also taken and afterwards exhibited to the identifying witnesses at the trial.

Defendant Bailey was arrested at about 6 o'clock on the afternoon of the robbery. According to his confession, immediately after his flight from the bank he changed his wearing apparel to elude identification. He threw his revolver into Westlake Park in the progress of his flight. Defendant Montijo was arrested at San Diego three days thereafter. Both Montijo and Bailey made complete confessions of their participation in the crime, which, of course, incriminated Lewis Perry. While Oscar Perry did not directly participate in the offense of robbery which resulted fatally to Officer Bond, the confessions of Montijo and Bailey implicated him as the driver of the automobile which conveyed the defendants to the scene of the crime and which disappeared shortly after the defendants fled from the bank.

[1] The positive identification made of the defendants by certain employees of the bank and by the two or three persons who by chance were transacting business with the bank at the time of the attempted robbery, considered in connection with other corroboratory evidence, established the guilty participation of the three defendants in the commission of the crime charged against them, beyond a reasonable doubt. Defendants Montijo and Bailey made confessions and each gave in detail accounts of the preparation made by the three defendants and Oscar Perry for the commission of the crime as well as the part each defendant actually took in its commission. Bailey took the officers over the route the defendants traveled in going to the bank and the course he took in his flight. Taken to the bank by the officers he pointed out the positions occupied by the several defendants, the bank employees and the customers. In fact he identified certain of the employees and passed a few words with them as to how certain ones acted under the stress of the situation. His description as to what took place and the sequence of events narrated by him made it morally certain that he had been an actor in the tragedy. Both Montijo and Bailey made mention of physical facts

which made it certain that their statements connecting them-
selves with the offense were true.

[2] The insufficiency of the evidence to sustain the judg-
ment is not, and in the light of the facts of this case, could
not well be urged as a sufficient ground to justify a reversal
of the case. It is urged that the court committed reversible
error by refusing to grant the motions of defendants Perry
and Bailey, in which Montijo did not join, for separate
trials. These motions were placed upon the ground that
it was believed by the other defendants that Montijo had
made a confession which was to be introduced in evidence
by the prosecution, incriminating both Perry and Bailey
and that any extrajudicial confession made by any one
of the defendants not in the presence of either of the others
was not admissible against either of the parties not present
and who were in no way a party thereto. Further, that if
the three defendants were tried jointly the confession of
Montijo would inevitably be considered by the jury that
was also to pass upon the guilt or innocence of the other
two defendants. Clearly Bailey was not prejudiced by any
confession that Montijo may have made, as he, too, had
made a confession that was practically demonstrative of
his guilt and was more damaging to him than any-
thing that Montijo had said or done. As to Perry, he
had been unmistakably identified by several persons as a
participant in the crime and within one hour after the
shooting was found bearing bullet wounds freshly made
upon his body. Identified clothing worn by him, revolvers,
cartridges and other physical facts had lain the weight of
guilt heavily upon him. Montijo, of course, like Bailey,
could not get away from his own confession, if it was legally
receivable in evidence. We have said this much prelimi-
narily to a consideration of the objection made, to show
that if it should be conceded that the court erred as to a
matter of procedure the error did not result in a miscar-
riage of justice. With the confession complained of wholly
eliminated from the jury's consideration the evidence was
amply sufficient to justify the conviction of all or any one
of the defendants. We are of the opinion, however, that
we cannot hold, as a matter of law, that the court abused
its discretion by refusing to order a separate trial as to
either Perry or Bailey.

Section 1098 of the Penal Code, as amended in 1921 (Stats. 1921, p. 90), provides as follows:

"Defendants jointly charged must be jointly tried. When two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, they must be tried jointly unless the court order separate trials. In ordering separate trials, the court in its discretion may order a separate trial as to one or more defendants and a joint trial as to the others or may order any number of the defendants to be tried at one trial and any number of the others at different trials or may order a separate trial for each defendant. . . . " The remainder of the section regulates the number of challenges that each defendant shall be entitled to if the trial be joint, and it is not germane to the point under consideration.

The motion for a separate trial for each defendant was presented at a seasonable time before the trial began and was based upon an affidavit made by the attorney for the moving defendants upon information and belief. It was averred that a confession had been made by Montijo which was to be offered in evidence by the prosecution and that the confession incriminated and implicated both Perry and Bailey in the commission of the crime charged. There was no averment or reference made to the fact that Bailey had also made a confession incriminating Perry and Montijo. The confession of Montijo, it was averred, would be highly prejudicial to defendants Perry and Bailey and even though limited by the court to the confessor alone, it would make an ineffaceable impression upon the jury which could not be disregarded by it and that it would influence the jury to the extent that said defendants would be substantially denied a fair and impartial trial. Prior to the amendment of 1921 each defendant jointly charged with the commission of a felony was entitled to be separately tried upon request made by him for a separate trial. [3] At common law a defendant jointly charged with others was not, as a matter of right, entitled to a separate trial. Our code section as it now stands is declaratory of the common-law rule. There is no decision of this court which disposes of the precise question here presented. The question, however, is not a new one. It has received the attention of the Massachusetts supreme court and the United States su-

preme court upon several occasions. *People* v. *Borasky,*
214 Mass. 313 [101 N. E. 377], presents the precise situa-
tion we have before us. The facts of that case are stated
in the opinion from which we quote:

"The indictment charged the defendant and one Antone
Kolek with having committed the crime of murder by killing
Rose Amansky. Both were convicted, but Kolck has de-
ceased. It does not appear to have been disputed at the
trial that the woman was murdered.

"Borasky seasonably filed a motion that he should have
a separate trial on the grounds that there would probably
be introduced in evidence a written confession made by
Kolek, which implicated both defendants, and that, as he
had been unable to obtain a copy, the court should order
the commonwealth to furnish a copy, in order that it might
be annexed to his motion. At the argument in support of
the motion the judge was requested to examine the con-
fession in the presence of the district attorney, and in the
absence of the defendant Borasky or his counsel. There
was no error in the denial of the motion. Whether two de-
fendants indicted jointly should be tried together is discre-
tionary with the trial court. This has been decided many
times respecting the trial of crimes involving a punishment ·
less than capital. (Citing Massachusetts cases.) In *Com-
monwealth* v. *James,* 99 Mass. 438, it was stated, in the
course of a trial for murder heard by the full court sitting
in banc for the trial of two defendants jointly indicted for
murder, that 'the general rule is that persons jointly in-
dicted should be tried together.' The confession was there
regarded as presenting 'an exceptional case' and it was
intimated that a separate trial would be granted if the
commonwealth intended to offer the confession. It was not
offered and was withdrawn by the commonwealth, and a
joint trial was had. It does not appear that the intimation
there was thrown out in any other way than as the exercise of
discretion. That such a motion is not to be granted as of
right but rests in the sound judicial discretion of the trial
court, even in capital cases, is the rule in the federal courts.
(*United States* v. *Marchant,* 12 Wheat. (U. S.) 480 [6 L. Ed.
700]; *United States* v. *Ball,* 163 U. S. 662, 672 [41 L. Ed. 300,
16 Sup. Ct. Rep. 1192, see, also, Rose's U. S. Notes].)
There is nothing in the case at bar to indicate any abuse

of discretion. Plainly, the court was not required to examine the alleged confession in the presence of the district attorney and in the absence of counsel for the defendant. During the trial the court was scrupulous to advise the jury, whenever any statements made by Kolek, in the absence of Borasky implicating the latter were offered in evidence, that they were not to be considered against Borasky.''

So, too, in the instant case, the jury was scrupulously admonished by the court whenever the confessions made by either Montijo or Bailey, were referred to, that such confession could not be taken as evidence against the party who had not made it, and it must be disregarded as to all the other persons. Not only was the admonition repeated time after time during the progress of the trial, but again in the final charge to the jury.

In almost every criminal trial in which two or more persons are jointly charged with the commission of an offense some fact, or facts, are developed against one of the defendants which cannot be regarded as evidence against the other. In the prosecution of criminal conspiracies, or that class of cases which require more than one to execute the crime, it quite frequently happens that damaging testimony admissible against one defendant, but not admissible against the others, is received in the case, but limited in its application to the one to which it is referable. Such evidence may carry with it an unfavorable effect equal in its harm to a confession. Yet it is not the rule in those jurisdictions in which the common law prevails or in states which have statutes similar to our own, that the defendants are entitled to a separate trial for that reason alone. The motion for severance in the case at bar was submitted to the sound discretion of the trial court, and considered with respect to the evident reason for the amendment, and the circumstances of the instant case, we cannot say that it was error to deny the motion. What we have said applies also to the separate request of Montijo, whose request was not supported by the same showing as was made in behalf of the other defendants.

[4] It is next urged that error was committed in overruling objections made by the defendant to testimony offered tending to identify a certain red, five-passenger Buick automobile, sport model, 1923, disc wheels, tan top, red upholstery, which, it is claimed, had been stolen, and was used

by the defendants in the perpetration of the crime. A young lady owned such a car which was stolen from her home, at about 8:30 o'clock, the evening before the crime was committed. Montijo, in his confession, described the machine used by Oscar Perry in conveying the defendants on the next forenoon to the vicinity of the bank building on a reconnoitering tour. His description corresponded generally with the machine stolen, to wit, a red Buick, five-passenger, sport model car. The witness William J. Brennan, a chauffeur, stopped his car a few minutes before 12 o'clock, on February 20, 1924, on Hoover Street at the corner of Seventh Street, to permit the traffic to pass. While thus abiding his time to cross Seventh Street, he heard the shots in the bank, and saw three persons come out of the bank. The first backed out with a pistol in his hand. The second also backed out. Both ran north on Benton Boulevard. The third came out a short time later and ran across a parkway or square between Benton and Hoover Streets. At that time a red Buick touring car left the corner of Seventh and Hoover Streets and turned into Sunset Place. The third person ran in the direction of this car, passing through Sunset Place. The witness could not see whether the party he observed running after the car got into it. The last he saw he was running after the car with a "gun" in his hand. Five minutes afterward he saw a car which he took to be the same car above referred to on the corner of Fourth and Westmoreland Avenue. Two persons occupied the front seat. The witness described one of the occupants as a "light haired fellow, and he seemed to be either lying down or stooped over. . . . He seemed to be stretched out, with his head on the back of the cushion—the top of the seat." Keeping in view the fact that Perry was the farthest from the front door of the bank and probably the last to leave the bank, and had been severely wounded, leaves little room for doubt that the person described was Perry. The witness described the car as being red, five-passenger Buick, red disc wheels, yellow top. The witness testified that the car first described by him resembled in all respects the car seen five minutes thereafter and the inference is that it was the same car. The last time it was observed by him it was traveling at a rapid rate of speed and was about three-quarters of a mile from the bank building. The description

of the car as given by witness Brennan agreed quite well
with the car that had been stolen the evening before. Be-
tween the hours of 1 and 2 o'clock P. M. on the after-
noon of the day of the crime Officer Theodore E. Robinson
discovered the automobile in which Perry had undoubtedly
been taken from the scene of the crime, as described by
witness Brennan, abandoned at 338 South Grand Avenue.
It corresponded in detail to the machine that had been
stolen. The motor was still warm and on the seat which
a companion of the driver would have occupied, there were
clots of fluid which had the appearance of being blood. The
car was about a block from Olive Inn, at which place Perry
had been rooming under the fictitious name of W. L. Grant.
He was identified by the landlady as a guest at her rooming
house. The officer watched the car until darkness came on
but no one came to claim it. The room assigned to Perry in
Olive Inn was number 8, but after receiving the wound he re-
turned to the inn surreptitiously and occupied another room,
to wit, room number 12, as the blood stains on the bed
clothing gave evidence. Doctor Bayless testified that he vis-
ited him in room 12. In his own room, however, a cartridge
clip containing a few cartridges of 44-caliber was found.
They sustained an evidentiary value in the case by compari-
son with the pistols and other cartridges introduced in evi-
dence. Upon motion of counsel for the defendants the court
struck from the record all of the testimony elicited from
the owner of the car as to it having disappeared from her
possession on the night before the crime was committed, in
a manner that indicated a theft of the car. Counsel as-
signed the reception of this testimony, although afterward
stricken from the record, as reversible error. Although this
testimony had a tendency to connect the defendants with
the theft of the automobile, it was clearly admissible. It
was rendered admissible as against Montijo and Bailey by
their confessions in which they described the red machine
driven by Oscar Perry which conveyed them to the scene
of the crime. It was in this machine, when en route to the
bank that Bailey was handed by either defendant Perry or
Montijo a 45-caliber automatic pistol. The evidence was
admissible as against Perry for the reason that it was shown
independent and extrinsic to the confession of any one of
the defendants that the stolen machine carried him away

after he was wounded. His brother was the driver. The
fact that the machine had been stolen did not render it in-
admissible. Its movements were in obedience to a plan out-
lined for the commission of the crime and it was proper that
all the evidence or pertinent facts tending to connect the
defendants or any of them with its use should have been
submitted to the jury. Whether the machine was stolen or
not by the defendants was of no great moment. The im-
portant question being, did these defendants commit the
crime and did the automobile incident tend to connect them
with its commission? **[5]** The rule is too firmly estab-
lished that evidence tending to connect a defendant with
the commission of a crime charged against him is not to
be excluded on the ground that it tends to connect him with
an offense not included in the charge, to require the citation
of a long list of authorities. (*People* v. *Sanders,* 114 Cal.
216, 230 [46 Pac. 153] ; *People* v. *Argentos,* 156 Cal. 720 [106
Pac. 65] ; *People* v. *Clark,* 70 Cal. App. 531 [233 Pac. 980].)
No error would have been committed had the testimony been
allowed to stand, and certainly none was committed by the
court in expunging it from the case.

The confessions of Montijo and Bailey appear to have
been freely and voluntarily made. The trial court so de-
termined and there is absolutely nothing in the record to
raise a doubt as to the correctness of its ruling. The wit-
nesses who gave testimony as to the confessions were ex-
amined at great length on their *voir dire* and counsel for
the defendants were not able to show that any threats, force,
or coercive measures were employed or that any induce-
ments or hope of reward were held out by those in author-
ity, or by any other person, to procure said statements or
confessions to be made. **[6]** The court is vested with a
wide discretion in passing upon the issue and its ruling
cannot be interfered with in the absence of a showing of
abuse. (*People* v. *Loper,* 159 Cal. 6 [Ann. Cas. 1912B,
1193, 112 Pac. 720] ; *People* v. *Siemsen,* 153 Cal. 387 [95
Pac. 863] ; *People* v. *Tugwell,* 28 Cal. App. 348 [152 Pac.
740] ; *People* v. *Castello et al.,* 194 Cal. 595 [229 Pac. 255].)
In resisting the introduction of the confession, Bailey made
the claim that he had been imposed upon by the officers,
who represented to him that his "pal" (Perry) had died and
in his dying confession had implicated him in the crime.

He further said that the officers, in an attempt to prove to him that Perry was dead, took him at 2 o'clock on the morning following the shooting to the Emergency Hospital, where Perry was lying on a bed with his eyes closed and that he presented the appearance of death. He observed him and believed him to be dead. This exhibition, together with the statement that Perry had implicated him, influenced him, according to his testimony, to make the confession offered against him. Bailey was, in fact, taken to Perry's bedside at the hour stated, but the several persons who were present at all of the times mentioned by Bailey, stated that absolutely no such statements or representations as stated by Bailey were made. Perry was aroused when Bailey was brought into his presence, and a conversation occurred between the officers and Bailey, and the officers and Perry, in turn, in the presence and hearing of Perry. The court properly admitted the confession and in its final charge went to the extent of instructing the jury that it was its right and duty to determine whether the confession of either Montijo or Bailey was obtained under promise of reward, immunity from punishment, or influenced by promises, duress, violence, force or fraud, and whether said confessions were freely and voluntarily made, and, if they should find that they were obtained by the employment of any of the methods enumerated, it was the duty of the jury to disregard said confession in its consideration of the case.

Specifications of error numbers 7, 8, and 9 may be treated together, as they raise the same point and are attacks upon the instructions of the court based upon the construction of section 189 of the Penal Code. That portion of the section which is germane to the point made, is as follows: "All murder which is perpetrated by means of poison . . . or which is committed in the perpetration or attempt to perpetrate arson, rape, robbery, burglary or mayhem, is murder of the first degree; all other kinds of murders are of the second degree." The purport of these instructions is, that if a human being is killed by any one of several persons jointly engaged at the time of such killing in the perpetration of or an attempt to perpetrate the crime of robbery, whether such killing is intentional or unintentional, or accidental, each and all of such persons so jointly engaged in the perpetration of, or attempt to perpetrate such crime

of robbery, are guilty of murder of the first degree. This is not only the clear meaning and effect of the statute but it is fortified by a number of the decisions of this court. [7] If a homicide is committed by one of the confederates while engaged in an attempt to perpetrate the crime of robbery in furtherance of a common purpose, the person or persons so engaged, but who did not actually do the killing, are as accountable to the law as though their own hands had intentionally fired the fatal shot or given the fatal blow, and such killing is murder of the first degree. The jury has no option but to return a verdict of murder of the first degree whether the killing was intentionally or accidentally done and it is proper to so instruct the jury. (*People* v. *Olsen,* 80 Cal. 122 [22 Pac. 125]*; People* v. *Milton,* 145 Cal. 169 [78 Pac. 549]; *People* v. *Bostic,* 167 Cal. 754 [141 Pac. 380]; *People* v. *Raber,* 168 Cal. 316 [143 Pac. 317]; *People* v. *Witt,* 170 Cal. 104 [148 Pac. 928]; *People* v. *Hadley,* 175 Cal. 118 [165 Pac. 442]; *People* v. *Manriguez,* 188 Cal. 602 [20 A. L. R. 1441, 206 Pac. 63]; 13 Cal. Jur. 600.)

[8] It is urged by the appellants that the court erred in giving the jury any enlightenment whatever on the subject of insanity. None of the instructions is challenged as being incorrect statements of the law, but it is insisted that no instructions whatever should have been given defining mental unsoundness for the reason that no claim was made that any one of the defendants was insane. It is, perhaps, true that no specific use was made of the word "insanity" by counsel, but five alienists, or psychologists, were called by the defense and gave testimony bearing directly on the mental deficiency of the defendant Montijo. His father was called to the stand to relate the story of his life. He recalled an injury which the defendant had received in his youth upon his head; also his incorrigibility as a youth, which resulted in his commitment to a reformatory; his roving inclinations and occasional nervous seizures to which he was subject, and mental peculiarities and obtuseness were brought into the case by the father's testimony. It was also shown that he had been a user of narcotics and some reference was made to a blood taint. The experts testified that his intellectual quotient, as gauged by the Binet-Simon test, Leland Stanford Jr. University Revision, was no higher

than that which a normal boy should register at the age of eleven years. [9] But the law does not substitute mental standardization in place of actual age as the sole test of responsibility for the commission of crime. None of the experts claimed that the defendant did not measure up to the law's standard of accountability, which, succinctly stated is, did he know the nature and quality of the act that he was committing, and if so, did he know that it was an act forbidden and punishable by law and that it was wrong to commit it? The testimony offered as to the mental status unquestionably furnished a basis for the contention that the defendant by reason of mental unsoundness, superinduced by injury, or caused by disease—acquired or transmitted— or brought about by the use of drugs, rendered him irresponsible and that he ought not be required to suffer the penalties prescribed as punishments for the violation of the law. Appellant's contention, plainly stated, is that the evidence offered on the issue of mental capacity should be considered as a mitigating circumstance and, perhaps, as a complete defense, and it was error for the court to have instructed the jury as to what mental infirmities will relieve an accused of punishment. We know of no decision, and none has been cited, which holds, that if a person offers evidence in his own behalf as to his mental infirmity with the object of mitigating his punishment, the court thereby becomes powerless to instruct the jury as to the legal standard by which accountability is to be determined. Insanity is a broad subject and includes many forms of mental disorders and degrees of mental weaknesses, and the kind and degree that will excuse crime is definitely settled by many decisions of this court. So far as accountability to the law is concerned there is no middle ground. The verdict of the jury must be guilty of the offense charged, or not guilty by reason of the insanity of the accused, or a plain verdict of not guilty. [10] It is the jury's right and duty to consider and weigh all the facts and circumstances attending the commission of the offense, and from these and such reasons as may appear to it upon a consideration of the whole situation, determine whether or not in the exercise of its discretion, life imprisonment should be imposed rather than the infliction of the death penalty. As a matter of fact, the right of the jury in the instant case to consider

mental weakness as a mitigating circumstance was not infringed in the slightest degree by anything said in the instructions. The instructions throughout dealt with the broad question of responsibility to the law and not at all with the jury's right to exercise its discretion with reference to any issue in the case. The jury was repeatedly told that if it should entertain a reasonable doubt as to whether the death penalty or life imprisonment should be imposed it could not, so long as it held such doubt, impose the extreme penalty. The following admonition is a fair example of the many instructions given on this subject: "If the jury should be in doubt as to the proper penalty to inflict the jury should resolve that doubt in favor of the defendant and fix the lesser penalty, that is, confinement in the state prison for life." This instruction appears so frequently in the charge as to make it certain that the jury was under no misapprehension as to its duty. It is true that an instruction was given which has its inception in our earlier decisions and which has been carried through the reports, drawing an occasional criticism as to its soundness, by which the jury are told, that while the law vests it with a discretion as to whether a defendant shall suffer death or confinement in the state prison for life, this discretion is not an arbitrary one, and is to be employed only when the jury is satisfied that the lighter penalty should be imposed. The precise instruction given in the instant case was considered in the very recent cases of *People* v. *Casade,* 194 Cal. 679 [230 Pac. 9], *People* v. *Wolfgang,* 192 Cal. 754 [221 Pac. 907], and other cases. The objection may be disposed of by a quotation from *People* v. *Rogers,* 163 Cal. 476 [126 Pac. 143], carried forward in the Casade case, which is as follows: "The law of the state thus appears to be thoroughly settled to the effect that the instruction in question is not erroneous." But if it could be said that there was any vice in the instruction, it was rendered harmless in the instant case by the closing paragraph of another instruction, which reads: "In the exercise of your discretion as to which punishment shall be inflicted, you are entirely free to act according to your own judgment. [11] Objection, without argument to support it, is made to the inclusion of that portion of section 21 of the Penal Code, which is probably given in a great majority of the criminal cases tried in this state,

and which reads as follows: " . . . all persons are of sound mind, who are neither idiots nor lunatics nor affected with insanity." The foregoing is a portion of the code section defining intent and we are unable to find any valid ground of objection thereto. [12] Objection is also made to the form of the verdict. It is contended that if the jury intended to impose the death penalty it should have been required to return a verdict expressly declaring such intent. This would be a departure from the settled form of procedure. The jury was repeatedly told that if it should return a simple verdict of guilty of murder of the first degree such a verdict would carry with it the death penalty, and, if in their judgment, any one or all of the defendants should be relieved of the death penalty, a verdict imposing life imprisonment should be returned. We see no merit whatever in appellant's objection to the forms of the verdicts.

Lastly, it is urged that the evidence does not justify the implied finding of the jury that the defendant Perry had arrived at the age of eighteen years on the day the murder was committed. Section 190 of the Penal Code, in part, provides as follows: " . . . provided, however, that the death penalty shall not be imposed or inflicted upon any person for murder committed before such person shall have reached the age of eighteen years; provided, further, that the burden of proof as to the age of said person shall be upon the defendant." Defendant's brother, Oscar Perry, who was shown by convincing evidence to have been *particeps criminis* with the others in the commission of the crime, testified that Lewis Perry was a few days under the age of eighteen at the time the murder was committed. At one stage of the proceedings the matter was referred to a juvenile court to determine the defendant's age and pass upon his fitness for consideration by that court. The court made no finding as to his age, but expressed the opinion that he was over the age of eighteen years, and remitted him to the superior court for trial on the ground that his case was not a proper one for that court to proceed with. At that proceeding the defendant testified that he was born at Dallas, Texas, and was seventeen years of age. He claimed that his birthday was February 12th. This would have made him eight days under the statutory age. He also admitted that

he was committed to the Preston School of Industry from Los Angeles County in the forepart of January, 1923. He admitted that he testified at the proceeding before the juvenile court during the forepart of January, 1923, and made representations to others that his birthday was January 5, 1922, and that he was seventeen on the day last above mentioned. According to this statement, made in the superior court sitting as a juvenile court, the defendant was more than a month past nineteen years of age at the time the murder was committed. The defendant attempted an explanation as to serious discrepancies concerning his age and said that he had set it forward in order to have the benefit of a jury trial on the charge pending against him, thereby ousting the juvenile court of jurisdiction of his person. His attention being called to the fact that he had not placed his age sufficiently high to bring him within the right to be dealt with in the superior court as an adult, he replied by stating that he understood the law to be the same here as it was in Texas, which provided that a person of seventeen years of age was entitled to have his case heard and determined in the superior court. There was then pending in Texas a charge of burglary against the defendant. One witness testified that the defendant had the appearance of being more than eighteen years of age. The jury evidently was not impressed with the testimony of either Lewis Perry or his brother, Oscar, as to the question of age. As between the defendant and his brother, it was not made definite as to whether Lewis Perry was born in January, February or March. Neither do the days of the month agree. All three of the months above mentioned are stated to be his birth months. The defendant was in the presence of the jury during a long trial and it had ample opportunity to make physical and mental observations of him. His connection with and the part he took in the crime and his demeanor thereafter furnished evidence of his maturity or immaturity, all of which was, no doubt, considered by the jury. [13] On the issue of age, the burden being upon the defendant, the implied finding that he had not sustained the burden which the law casts upon a defendant cannot be disturbed under the evidence.

The order and judgment appealed from in each case is hereby affirmed.

Lawlor, J., Richards, J., Shenk, J., Waste, J., Myers, C. J., and Lennon, J., concurred.

Rehearing denied.

All the Justices concurred.