[Crim. No. 1606.   First Appellate District, Division Two.—November 21, 1931.]

THE PEOPLE, Respondent, v. MINNIE RODERICK et al., Appellants.

460

Joseph J. Bullock, Gilbert D. Ferrell and Fred W. Comba for Appellants.

U. S. Webb, Attorney-General, and William F. Cleary, Deputy Attorney-General, for Respondent.

SPENCE, J.—The defendants were jointly charged with having murdered one Frank Roderick. They were tried together before one jury and separate verdicts were returned finding each defendant guilty of the crime of murder in the first degree and fixing the punishment of each at imprisonment for life. Motions for new trials were made and denied and judgments were pronounced. Appeals have been taken by said defendants from the judgments and the orders denying their motions for new trial.

Frank Roderick, deceased, lived upon a ranch in San Mateo County with his wife, his children and a hired man. He was last seen alive by others on May 14, 1930. Appellant Minnie Roderick, his wife, and appellant Woodring, the hired man, both admitted seeing him on the morning of May 15, 1930. On that date he disappeared and his body was not recovered until June 27, 1930, when it was found with a bullet wound through the skull buried about twenty-six feet under the ground in an abandoned well on the premises.

Prior to the trial each of the appellants denied any participation in the killing of the deceased and after arrest each made statements showing or tending to show that the deceased had met his death at the hands of the other on the morning of May 15, 1930. The prosecution presented a vast

amount of circumstantial evidence and proceeded upon the theory that the appellants had conspired together to kill the deceased, to dispose of his body and to conceal the fact that the crime had been committed.

Appellant Woodring contends that the evidence is insufficient to sustain the verdict against him and the appellant Roderick contends that the evidence is insufficient to sustain the verdict against her. In our opinion both contentions are without merit. We will not attempt to set forth in detail all of the evidence upon which the prosecution relied. A summary of some of that evidence covers twenty-eight pages of respondent's brief, but we do not believe that such lengthy summary is required here.

Appellant Woodring had been living upon the Roderick ranch for some time prior to May 15, 1930, and continued to live there up to the time of his arrest on June 22, 1930. He was thirty-seven years of age and the appellant Roderick was thirty-two years of age. Although both appellants denied any intimacy between them, the evidence showed that the attitude of appellant Roderick toward appellant Woodring was not the attitude ordinarily assumed toward a hired man. They were frequently seen together at various places prior to the death of the deceased, sometimes in company with the deceased and sometimes not. They frequently kissed each other, which fact appellants attempt to minimize because on some of these occasions the deceased was present and for the further reason that appellant Roderick had kissed other men. The witness Mrs. Anderson, who was employed by appellant Roderick after the death of the deceased and lived at the ranch, testified that appellants were always together and that she had seen appellant Woodring kissing appellant Roderick about three or four times a week.

The story of the family life at the Roderick ranch prior to the death of the deceased is a sordid tale to relate. We shall not present it in detail. There was abundant evidence in addition to the testimony of appellants showing that each of the appellants had frequently quarreled with the deceased. The evidence showed that the parties had freely indulged in the use of alcoholic liquors, had freely used profane language and that threats and drunken scuffles were not infrequent. In his reply brief, appellant Woodring speaks of these "parties, drunken scuffles and outbursts of

profanity involving all parties on the Roderick ranch and neighboring localities'' as ''commonplace and perfectly natural events''. In her reply brief, appellant Roderick speaks of her threats against her husband as mere idle threats ''so commonly used as to be properly classified as slang''. These consisted of various threats uttered during quarrels such as ''You go on, you God damn Portuguese or I will shoot you.'' ''I will kill you,'' ''I will cut your heart out'' and ''Get out of here you Portuguese s—— of a b—— or I will shoot your head off.'' In April, 1930, deceased and appellant Woodring had a fight in the home of the witness Hildebrand in which they broke down a door and scuffled on the floor until separated by the witness. The same witness was present on May 11, 1930, which was four days before the death of the deceased, when deceased and appellant Woodring again had a fight on the Roderick ranch in which foul words were used and blows were exchanged. Appellant Woodring testified that this altercation followed the failure of himself and appellant Roderick to wait, on that day at a place called Carlson's Camp until the deceased had arrived; that when deceased returned to the Roderick ranch he quarreled with appellants, saying that he had been told that appellant Woodring had induced appellant Roderick to leave and not wait for the deceased at the camp; that the appellant Woodring then said: ''Whoever said that told a damn lie''; that deceased thought appellant Woodring had called him ''a damn liar'' and the altercation ensued. Whatever attempt may be made by appellants to belittle the effect of evidence relating to the prior relations of the parties, the jury was warranted in attaching to such evidence a far greater significance than appellants would have accorded to it. Suffice it to say that the jury could very properly conclude from the evidence that the relationship of appellants toward each other had been more than friendly and that each had borne a feeling of hatred and malice toward the deceased.

On the morning of May 15, 1930, the Roderick children had gone to school and there were but three people on the ranch, the deceased and the two appellants. The only direct testimony purporting to show what occurred on the ranch that morning was the testimony of the two appellants. Their stories were irreconcilable and it is apparent that the

jury could and did properly attach little if any credit to either. Omitting for the present the testimony of both appellants relating to what happened on the morning that the deceased was killed, we will proceed to consider some further circumstances brought out by the prosecution. At about noon of that day appellants together visited a resort known as Peek-a-Boo Inn located at La Honda about six miles distant from the Roderick ranch. At that place they stated that "they had been driving cattle all morning and they were tired". It may be noted that at no time thereafter did either appellant testify or make any statement to this effect, but their statements and testimony showed that they were occupied with doing things other than driving cattle. Appellant Woodring in the presence of appellant Roderick further stated that Frank Roderick had "disappeared with some red-headed woman in a *Cadillac* car". About 2 o'clock of the same day appellants visited the store of Archie Woodhams at La Honda and appellant Woodring in the presence of appellant Roderick "said that Frank Roderick was on a wild tear up at the ranch and that they came down to get away from him a little while or something similar to that". On the following day, May 16th, appellants went to Palo Alto and in a conversation with Mrs. Anderson, who subsequently came to the ranch, appellant Roderick in the presence of appellant Woodring stated that on the previous day 'her husband left with a red-headed woman in a big *Hudson* sedan and left her (appellant Roderick) lying unconscious on the kitchen floor". She further stated that her husband had taken $2,800 with him.

On May 17th, one Rapley, a neighbor, visited the Roderick ranch and saw appellant Woodring hauling manure in a truck, the truck being fifteen or twenty feet from the abandoned well at the time. When asked what he was doing, appellant Woodring said: "I am moving the manure from the barn—I had to do that or move the barn." On the same day appellant Roderick had a conversation with Dr. Clattenburg at his office in Redwood City at which she made a statement similar to those previously made about her husband leaving with some woman. On May 20th appellant Roderick appeared before a justice of the peace in Redwood City and swore to a complaint charging Frank Roderick with the crime of battery and advised the deputy sheriff

that her husband had beaten her and then disappeared. She gave a description of her husband, including the fact that he was dressed in a "banker's gray suit" and stated that she assumed that he had gone to Australia as he had many times said he intended to do. On May 24th the sheriff visited the Roderick ranch and talked with the appellants. Appellant Roderick told him that at about 11 o'clock on the morning of May 15th Frank Roderick came into the house and told her he was going away "with this red-headed woman" and he thereupon "dressed in his banker's gray suit and left in this Hudson, brand new Hudson sedan". Appellant Woodring told the sheriff that "he saw the Hudson car leaving the place and thought there was a woman in there". He further said that he thought the woman who went away with Frank Roderick was the same woman he had met one evening while with Frank Roderick in La Honda and that on their return home on that occasion Frank Roderick had said to appellant Roderick "Well, Bill met my red-headed sweetie". Both appellants told of appellant Woodring coming into the house on the morning of May 15th and finding appellant Roderick in a semi-conscious condition. Appellant Roderick further stated that Frank Roderick took $2,800 with him, showing the sheriff a bankbook, which, however, showed no withdrawals.

On May 27th appellant Woodring told one Leslie Simpson that Frank Roderick was in Tia Juana on "one of his little annuals". On or about the same day he told one George Steinberg that "Roderick had come back and was a dreadfully sick man". On June 13th appellant Roderick verified a complaint for divorce against Frank Roderick, which complaint was subsequently filed on June 18th. The complaint alleged extreme cruelty on the part of Frank Roderick specifically stating that he had frequently beaten her with clenched fists and called her vile names; that frequently and without cause he had beaten their two children; that on May 15th he had violently struck her, causing her to fall to the floor unconscious and had left the premises and that since that day she had not heard from him and did not know where he was. Upon the trial appellant Roderick testified that these allegations were false.

On June 14th, appellant Woodring delivered a note written by appellant Roderick to one James Allen reading

"please leave Mr. Woodring have a scraper if you have one, and I will make it alright with you". Thereafter on June 16th, one James McGraney was hired by appellant Woodring to help him do some "road work" on the Roderick ranch. The work commenced on June 16th and continued for several days. This work was done in the vicinity of the well, but the well was covered by a scraper so that McGraney did not know there was a well there. On the second day, appellant Woodring sent McGraney to work in the hayfield cutting hay telling him to stay there until it was finished. The scraper was over the well when he left for the hayfield but the following morning it was up against the fence. At one time during the plowing near the well, McGraney had told appellant Woodring that if the scraper was moved, the work would be facilitated and Woodring replied that he was driving the team. On the third day, appellant Roderick came to where the work was being done and ordered them to stop work stating that "it did not benefit the road any".

On June 22d, appellant Woodring was arrested and subsequently testified that he did not know at that time what he was arrested for. He further testified, however, that he had previously heard conversations to the effect that possibly the body of Frank Roderick was in the well and appellant Roderick's folks and the lawyer were "building up a frame that I was the guilty guy that was the cause of the disappearance of Frank Roderick". The witness Mr. Anderson further testified that on the Sunday before his arrest, Woodring had quite a bit to drink and said "If I get hung at San Quentin—come to see me and say 'there is an innocent man hung'." Appellant Roderick was not arrested until June 27th which was after the recovery of the body of the deceased. In the meantime, after appellant Woodring was arrested, appellant Roderick had endeavored to procure his release on bail.

On June 26th, a deputy sheriff and others started a search for the well. The vicinity had been recently plowed and scraped and all evidence of its location had been obliterated. They could not find it until given the approximate position by one familiar with its location. The digging of the well was started on that day. On the following day, the deputy sheriff told appellant Roderick that they were

going to dig to the bottom of the well, whereupon she told them she hoped they would, that "you will find a lot of old tin cans and stuff had been put in there when we first took the ranch, that is, when my husband and I took the ranch—you will find a lot of manure there that Frank put there before he left". Below the surface, the digging proceeded through gravel, rock and manure and then through a quantity of junk such as pieces of old stove, auto tires and rims, pieces of harness and the like. Among the rubbish was found a copy of the "San Francisco Examiner" of May 22, 1930. Many feet of manure lay beneath and when the digging had proceeded to a depth of about twenty-six feet the decomposed body of the deceased was found. On the evening of June 26th, and after the digging had started, appellant Roderick had said to Mr. Anderson, "I hope they do not go down there very far, because there is a calf down there. They will think Woodring is cattle stealing." Appellant Roderick was arrested following the discovery of the body of the deceased. The body was found dressed in working clothes and not in a "banker's gray suit" and was partially wrapped in a burlap sheet.

We may now briefly consider some of the conflicting testimony of appellants given on the trial. Appellant Roderick testified that on the morning of May 15th she was in the house and heard a shot; that she came out and saw appellant Woodring and when she asked him "who shot?" he commanded her to keep still; that he told her to get her car out and threatened to kill her if she did not do so; that when she backed the car out to the place indicated by appellant Woodring, she saw the body of her husband on the ground partially covered with canvas and rope; that she started to "holler" and again appellant Woodring threatened to kill her; that appellant Woodring placed the body of deceased on the running-board of the car and commanded her to drive to the well; that she did so and then appellant Woodring lifted the body into the well; that she saw appellant Woodring haul two loads of manure from the manure pit and go in the direction of the well; that later he came into the house and told her to tell the story about her husband running away with a red-headed woman and taking $2,800 with him; that he

threatened to kill her if she did not tell that story; that later appellant Woodring said he wanted a drink, pulled her through the door and told her they were "going down the line to see people".

Appellant Woodring testified that on the morning of May 15th, the deceased sent him to do some work in the fields and that he did not return until about 11 o'clock; that as he came near the buildings, he saw appellant Roderick go into the house with a rifle in her hand; that some time later he went into the house and found appellant Roderick lying on the floor; that she told him that her husband had hit her and had gone away with a red-headed woman taking $2,800 with him; that later appellant Roderick asked him to drive her down to Peek-a-Boo Inn; that as he went to the garage to get the car, he noticed signs of some heavy object having been dragged along the ground; that he mentioned this to appellant Roderick who stated that they had been cleaning up around the place and had dragged stuff from there over to the well.

Both appellants denied any intimacy between them. Each denied any trouble with or ill feeling toward the deceased, but each gave abundant testimony regarding the quarrels and bitter feeling of the other toward the deceased. Appellant Roderick denied that she had participated in the killing of the deceased and appellant Woodring likewise denied that he had participated in such killing. Appellant Roderick endeavored to explain her actions following the killing of the deceased by her testimony to the effect that she had acted under the threats of appellant Woodring. Appellant Woodring, on the other hand, although admitting that he filled the well, maintained that he then knew nothing of the death of the deceased and filled the well under orders from appellant Roderick. A reading of the testimony shows that the jury was warranted in giving no credence to the story of either appellant.

We shall not detail the conflicting statements made by appellants after arrest and prior to trial. We may observe, however, that in the statements made by appellant Roderick following the arrest of appellant Woodring and before her arrest, she made no statement implicating appellant Woodring nor did she refer to any threats on the part of appellant Woodring. After the discovery of the body of the

deceased and the arrest of appellant Roderick, she was interviewed at length on June 28th and again on June 30th, but denied any knowledge of the killing and made no mention of any threats. In a second interview on June 30th, she admitted that many of her previous statements were false and stated that she knew the deceased's body was in the well but did not know who put it there. It was at this interview that she first made the statement that she feared appellant Woodring and that the previous stories she had told were made up by him and told by her because he had coerced and threatened her. We may further observe with respect to the appellant Woodring, that prior to the time of trial he denied all knowledge of the killing except that when interviewed on July 2d he stated that he had heard a shot on the morning of May 15th as he came from the field and had seen appellant Roderick going into the house with a 30–30 rifle. This statement was not made until ten days after his arrest. Upon the trial, he related for the first time an alleged confession made to him by appellant Roderick some days before his arrest. He testified that up to the time that appellant Roderick made this confession to him, he had never told her that he saw her going into the house with a gun. He further testified that he had not told the authorities of so seeing appellant Roderick prior to July 2d as he relied on her promise to tell it herself. Upon cross-examination, it appeared that appellant Woodring had not divulged the alleged confession of appellant Roderick to anyone, not even to his attorney, prior to the time that he related it on the witness-stand. When asked the reason, his statement was ''Simply the reason why that I thought it would be best to tell it in court, I had waited so long to explain it.''

The foregoing evidence pointed unerringly to the fact that the deceased had met his death at the hands of one or the other or both of the appellants. The apparent affection existing between appellants up to the time of their arrest, their frequent quarrels and altercations with the deceased, their presence on the ranch when the crime was committed, their false statements made following the disappearance of the deceased, their concealment of known facts from the authorities and other conduct tend-

ing to conceal the commission of the crime, all made it logical for the jury to conclude that the killing of the deceased and the disposition of his body was the result of a concert of action on the part of both appellants. It was but natural that after arrest and mature deliberation, each of the appellants should relate a story denying participation in the killing of the deceased, but in the light of the other evidence, it was but natural that the jury should decline to accept the story of either.

In passing upon this question of the sufficiency of the evidence, we must assume in favor of the verdict every fact which the jury could have reasonably deduced therefrom and then determine whether such facts are sufficient to support the verdict. (*People* v. *Tom Woo,* 181 Cal. 315, 326 [184 Pac. 389].) In our opinion the foregoing evidence was ample to sustain the verdict against both of the appellants. We are further of the opinion that there is no merit in the point made by appellant Woodring that the conviction of said appellant rests wholly upon the uncorroborated testimony of appellant Roderick, his accomplice. It does not appear that the conviction of either appellant rests upon the testimony of the other, but assuming that parts of the testimony of each appellant were accepted by the jury, there was ample other evidence tending "to connect the defendant with the commission of the offense" and that is all that is required. (Pen. Code, sec. 1111; *People* v. *Haughey,* 79 Cal. App. 541 [250 Pac. 406]; *People* v. *Taylor,* 70 Cal. App. 239 [232 Pac. 998].)

Both appellants further contend that even assuming the evidence to be sufficient to warrant a conviction there was no evidence to sustain a conviction of murder in the first degree, citing *People* v. *Kelley,* 208 Cal. 387 [281 Pac. 609], and *People* v. *Howard,* 211 Cal. 322 [71 A. L. R. 1385, 295 Pac. 333]. The authorities cited are not in point. Here there was evidence to show motive and there was ample evidence, circumstantial in nature, to support the implied finding of the jury that the killing followed a wilful, deliberate and premeditated plan on the part of appellants to take the life of the deceased.

Appellant Roderick contends that the trial court erred in not sustaining her challenge to the panel summoned pursuant to the special venire. When the regular panel

was exhausted, the court ordered a special venire. Shortly after the order was made the sheriff made a return and twenty persons were brought into court. A challenge was interposed on the ground that said persons had not been summoned after the court had made its order. Evidence was introduced to show that on the preceding day members of the sheriff's office, acting on the suggestion of the clerk of the court, communicated with twenty persons and assembled them in the room of the board of supervisors in anticipation of the order for a special venire. The challenge was based solely upon the method by which these persons were produced. In the trial court counsel for appellant Roderick stated ''we have no objection to the character of the citizens and persons summoned, it is to the method and *operandi* by which they are produced in this court''. Neither in the trial court nor on this appeal has any charge of bias been made against the officer who summoned the panel. Although a defendant's right to challenge such panel appears to be limited to the ground of bias on the part of such officer (Pen. Code, sec. 1064; *People* v. *Manuel,* 41 Cal. App. 153 [182 Pac. 306]), we do not wish to be understood as expressing approval of the method adopted here. It was irregular and should not be followed, but it does not appear that appellants were thereby prejudiced in the present case. There being no claim of bias upon the part of the sheriff nor upon the part of the persons summoned, we cannot conclude that appellants were not accorded a fair trial at the hands of the jury selected. In fact, but one of the persons summoned on the challenged panel was ultimately selected and the jury was sworn at a time when each of the appellants had four peremptory challenges yet unexercised. Counsel for appellant Roderick, who now urges the objection, then said: ''The defendant, Mrs. Roderick, is satisfied.''

Both appellants assert that the trial court erred in denying their motions for separate trials. We find no merit in this point. Since the amendment in 1921 of section 1098 of the Penal Code (Stats. 1921, p. 90), defendants jointly charged are not entitled to separate trials as a matter of right. That section now reads: ''When two or more defendants are jointly charged with any public offense, . . . they must be tried jointly, unless the court

order separate trials." It is well settled that the denial of separate trials will not warrant a reversal in the absence of a clear abuse of discretion and that such abuse of discretion may not be predicated merely upon the showing that testimony would be introduced at the trial of confessions or other extrajudicial statements, admissible against one defendant but not admissible against the other. (*People* v. *Erno*, 195 Cal. 272 [232 Pac. 710]; *People* v. *Perry*, 195 Cal. 623 [234 Pac. 890]; *People* v. *Burdg*, 95 Cal. App. 259 [272 Pac. 816]; *People* v. *Remington*, 74 Cal. App. 371 [240 Pac. 526]; *People* v. *Booth*, 72 Cal. App. 160 [236 Pac. 987].)

■ Appellants contend that the trial court erred in the giving, refusing and modifying various instructions. Appellant Woodring complains of the refusal to give his requested instruction which started with the statement: "You are instructed that the defendant Minnie Roderick is an accomplice in the crime of the murder of the deceased." This instruction was properly refused. The evidence was conflicting and it would have been reversible error so far as appellant Roderick was concerned for the court to instruct the jury that appellant Roderick was an accomplice as a matter of law. The question of whether appellants were accomplices might well have been submitted to the jury under proper instructions, but no such instructions were requested. As both appellants contended that there was no concert of action between them, it cannot be said that the trial court erred in not giving such instructions of its own volition. ■ Appellant Woodring further complains of the refusal to give his proposed instruction relating to the subject of reasonable doubt and particularly with reference to the question of reasonable doubt concerning one's aiding and abetting in the commission of offense by another. The subjects were fully and correctly covered by the court in other instructions.

■ Appellant Roderick complains of the refusal of the trial court to give various proposed instructions upon the subject of principals and accessories and of the modification of the following proposed instruction: "If you believe from the evidence that the defendant Minnie Roderick was not present when Frank Roderick was killed, and did not aid or abet in the killing, and the defendant, Minnie Roderick,

at the time or prior to the killing, had not conspired with any person to commit the act, and that she had not advised and encouraged any person or persons therein, and that the killing was not done in pursuance of any conspiracy between the defendant Minnie Roderick and the defendant William Woodring or any other person to kill Frank Roderick, *and that the defendant Minnie Roderick, only assisted in throwing the dead body of Frank Roderick, in the well,* then you are instructed that, under the indictment, you must find the defendant Minnie Roderick not guilty''. The trial court gave this proposed instruction omitting the portion italicized. There was no error in this modification. The instructions as given covered the subject as fully as appellant was entitled to have it covered and the italicized portion, if included, could have served only to convey to the jury the impression that appellant Roderick's admitted participation in concealing the body could not be considered with other evidence in determining whether she had participated in the killing of the deceased.

Much is said in the briefs of appellant Woodring regarding the following statement of the trial court in the early part of the instructions: ''A murder was committed in this county on the 15th day of May of this year. Upon that point there is no dispute.'' It is claimed that the trial court thereby erred in instructing the jury upon a question of fact. This contention might require serious consideration under certain circumstances, but here it was assumed by all throughout the trial that a murder had been committed. Appellant Woodring did not defend upon the ground that no murder had been committed, but based his defense upon his testimony to the effect that he had no connection with the killing and no knowledge thereof until shortly before his arrest. The inconsistency of appellant Woodring's position is demonstrated when he complains about the giving of the foregoing instruction and in the same breath strenuously insists as hereinbefore stated that the trial court erred in refusing his proposed instruction reading: ''You are instructed that the defendant Minnie Roderick was an accomplice in the crime of the murder of the deceased.'' We have read the entire charge to the jury and are satisfied that the jury was fully and fairly

instructed and that there was no prejudicial error in the giving or refusing of any of the instructions.

Appellant Woodring further contends that the trial court erred in the admission and exclusion of evidence. In the numerous specifications of alleged error set forth in a few pages of the brief, said appellant contents himself with page references to over 100 different pages of the transcript without quoting in the brief the portions of the record wherein it is claimed that error was committed. We have been at pains, however, to read the entire record with special reference to the pages specified. Many of the said appellant's objections related to extrajudicial statements of the appellant Roderick made out of the presence of appellant Woodring. It was frequently stated in the trial that such statements were offered and admitted solely against the defendant making such statements and not as against the other defendant. Furthermore, the jury was clearly instructed to that effect during the trial and also in the main instructions given before the cause was submitted to them. Many of the rulings excluding evidence were made during the cross-examination of the witnesses by counsel for appellant Woodring. In practically every instance, the questions propounded covered irrelevant matter or new matter of a defensive nature which carried the scope of the inquiry beyond that of the direct examination. We are satisfied that there was no prejudicial error in the rulings of the trial court.

Appellant Roderick makes the further contention that the trial court erred in striking out the testimony of Filbert Roderick, the twelve year old son of appellant Roderick and the deceased, who was called as a witness by said appellant. This testimony was stricken out on motion of appellant Woodring. Assuming, without deciding, that the trial court erroneously granted the motion, it does not appear that this action resulted in prejudice to the appellant Roderick. No objection was interposed by said appellant to the granting of the motion and a reading of the testimony leads us to the conclusion that said appellant may have been entirely willing to have the testimony stricken. Although the boy testified on direct examination that there were no family quarrels or beatings, he admitted on cross-examination that he previously told the district

474

attorney that his mother and father had arguments because his father "wanted to kick Bill (appellant Woodring) out" and that his father "would accuse mother with Woodring". He thereafter testified that his previous statements to the district attorney were untrue, but further cross-examination by the district attorney and counsel for appellant Woodring was curtailed by the trial court owing to the age of the witness. The boy's direct examination did not exculpate appellant Roderick and was at variance with said appellant's sworn and unsworn statements made prior to the trial. If his direct testimony could be said to have any value, he was effectively impeached by his own admission on cross-examination. We therefore conclude that the granting of appellant Woodring's motion to strike out his entire testimony could not have been harmful to appellant Roderick.

A further contention made by the appellant Woodring is that the district attorney was guilty of prejudicial misconduct in that he did not more vigorously prosecute the appellant Roderick. This is a novel ground upon which to base a charge of misconduct. No authority is cited by said appellant to sustain his contention and we know of none. In passing, however, we may add that we find nothing in the manner in which the district attorney presented the case to justify a charge of misconduct. Appellant Woodring further claims that the trial judge was guilty of misconduct. The assignments under this heading relate to the action of the trial judge in ruling upon the admission of evidence and in advising the various witnesses on numerous instances to refrain from answering questions asked. Owing to the numerous times upon which the trial court of its own motion instructed the witnesses not to answer, we have as hereinbefore indicated read the entire record with particular reference to the pages enumerated by counsel. As stated above, we find no prejudicial error in the rulings nor do we find any prejudicial misconduct on the part of the trial judge.

Contending that the trial court erred in refusing to grant his motion for a new trial, appellant Woodring calls attention to the fact that practically all of the points urged on this appeal were urged upon the motion for new trial. The motion was not based upon any grounds other than those herein considered.

For the foregoing reasons the judgments and orders denying the motions for new trial are and each of them is affirmed.

Nourse, P. J., and Sturtevant, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on December 5, 1931.