STATE of North Dakota, Plaintiff and Respondent,

v.

Donald MALNOURIE, Defendant and Appellant.

Cr. 253.

Supreme Court of North Dakota.

Dec. 6, 1954.

Douglas B. Heen, Devils Lake, for defendant and appellant.

E. T. Christianson, Atty. Gen., J. K. Murray, Sp. Asst. Atty. Gen., and H. L. Malloy, State's Atty., Halliday, for plaintiff and respondent.

BURKE, Judge.

On January 17, 1953, the defendant, Malnourie, pleaded guilty to an information charging him with the crime of murder in the first degree. Following his plea he was immediately sentenced to imprisonment for a life term in the state penitentiary.

On May 27, 1953, this defendant moved the trial court to vacate the judgment and sentence made and entered in the case and to allow him to withdraw his plea of guilty. The motion was grounded upon this defendant's contentions that his plea was induced by coercion, fraud and duress and that he was denied the right of the assistance of counsel. The trial court denied this motion and defendant has appealed from the order of denial.

The defendant, Malnourie, is a three-quarter blood Indian. He has had a sev-enth grade education and at the time of his arraignment was twenty-four years old. He resided on the Ft. Berthold Reservation with his mother and stepfather, Mr. and Mrs. John Starr and his half-sister, Cynthia Starr. On January 1, 1953, this defendant and John Starr and Cynthia Starr left home in the family car at about eleven o'clock A.M. They arrived at Zap at about noon. There they purchased three pints of wine and commenced drinking. Later in the afternoon they stopped at Dodge where they bought some whiskey. They spent the rest of the afternoon in drinking and driving about from place to place. Early in the evening they arrived in Halliday where they bought three more bottles of wine. At Halliday, they were joined by Oscar Whiteman, who was also of Indian blood. When Whiteman entered the Starr car, he sat in the front seat with the defendant and Cynthia. At that time John Starr was asleep in the back seat, apparently in a state of extreme intoxication.

According to this defendant's story, his last recollection of the events of the evening was riding around Halliday and drinking with Cynthia and Whiteman. He recovered his memory as he was walking into Richardton early the next morning. In Richardton, he "picked up" an automobile, intending, he said, to drive back to the Reservation. About two miles north of Richardton he came upon the Starr automobile parked on the highway. John Starr was still asleep in the back seat but Cynthia and Whiteman were missing. This defendant than abandoned the car he had appropriated in Richardton and drove the Starr car to a point about two miles north of Halliday where the car became "stuck on the highway." This defendant then walked into Halliday to look for a ride home. Finding none he returned to the Starr car and went to sleep. At about ten o'clock A.M. a patrolman came upon the parked car and after an investigation arrested this defendant upon a charge of having an open bottle containing an alcoholic beverage in the car. This defendant was immediately taken before a justice of

the peace and arraigned on this charge. He pleaded guilty and was sentenced to a term of fifteen days in the county jail at Manning.

Late on the evening of January 4th, Mrs. John Starr, mother of both this defendant and Cynthia, notified Lynn Amsden, an officer of the state highway patrol, that Cynthia had been missing since January 1st. An investigation disclosed that she had been last seen in the company of this defendant and John Starr and Oscar Whiteman. On January 7th, this defendant was moved from the county jail at Manning to the city jail at Halliday. On that afternoon he was questioned by the sheriff, Jack Pavlenko, and by the highway patrolman Amsden. On January 7th, Whiteman was taken into custody and brought to Halliday. On January 8th, both men were questioned all day long, commencing at ten o'clock in the morning. Referring to this defendant, Amsden said, "he was asleep part of that night." On January 9th, the questioning continued. At some time during this day, Whiteman gave the officers some information, the exact nature of which is not disclosed, that led them to believe that the body of Cynthia Starr might be found somewhere in the vicinity of the Big Flat School House, which was located about twelve miles south of Halliday. Late that afternoon the two suspects were taken out to the grounds of this school house for the purpose of locating Cynthia's body. The officers present at the school house were the sheriff, Jack Pavlenko, a deputy sheriff, Leo Lesmeister and the state patrolman, Lynn Amsden. There was also present a crowd of from ten to thirty other men, according to the varying estimates of the witnesses. In this company this defendant was asked to tell where Cynthia's body was. He replied that he did not know. There is some dispute in the evidence as to what happened next. Sheriff Pavlenko testified that this defendant's reply was impudent, that he slapped him three times with his open hand and that this defendant slipped and fell to the ground. Other witnesses testified that this defendant was not only struck and knocked to the ground by the sheriff, but also by the deputy sheriff and some of the spectators and that the blows were accompanied by demands to tell where the body was.

It is undisputed that on this occasion some of the spectators tied one of Whiteman's arms to a fence post with a chain of some sort, and his other arm to the cable of a winch on a wrecking car. He was then told he would be pulled apart if he didn't tell what had been done with Cynthia's body. Patrolman Amsden testified that he stopped this proceeding by stating, "These two boys are going to the penitentiary anyway and there was no use of some of them going." Sheriff Pavlenko minimizes the incident by stating that he stopped it before it was well started. There appears to be a substantial conflict in the testimony of the two officers both as to the person who stopped the incident and as to the extent to which it had been carried before it was stopped.

Thereafter the two suspects were taken back to the city hall in Halliday. The men who had been in attendance at the Big Flat School followed, and despite the hostility which they had exhibited toward the two suspects, and their actions which had at least approached mob violence, they were permitted to enter the hall and attend the continued questioning of this defendant and Whiteman. Patrolman Amsden testified that while the examination continued, audible remarks, such as, "Make them tell," "If they don't tell, turn them over to the Indians" and "burn them at the stake," came from the crowd. He even admitted that he might have made similar remarks himself. No attempt to clear the hall or to quiet the crowd was made by any of the officers present. The examination of the suspects continued until two o'clock A.M.

The next morning, January 10th, Amsden aroused this defendant at six o'clock and took him to Richardton. Amsden had a theory that this defendant might have transferred the body of Cynthia from the Starr car to the one he had stolen in Rich-

ardton and the trip was made for the purpose of checking this theory. When they returned to Richardton they learned that Cynthia's body had been discovered in the vicinity of the Big Flat School. They proceeded immediately to this location and this defendant was led over to view the body with his hands cuffed behind his back. According to this defendant, when he saw his sister's body he broke down and cried, and in order to get away from the harrowing scene admitted responsibility for her death. The officers present all state that he "tried to put on an act" and admitted that he killed her. Later that afternoon, defendant was taken to the office of the state's attorney where, after a conference with the officers he signed a statement admitting that he killed Cynthia Starr by hitting her on the head with a wine bottle. At this conference he at first denied any knowledge of the means by which Cynthia met her death. Besides the defendant, there were present H. L. Malloy, the state's attorney, Jack Pavlenko, the sheriff, and Lynn Amsden the state patrolman. After the conference had continued awhile, the sheriff told Mr. Malloy and Mr. Amsden that this defendant would like to talk to him alone. Mr. Malloy and Mr. Amsden then went out for a cup of coffee. When they returned the sheriff told them that this defendant was ready to sign a statement. After signing the statement this defendant was returned to the county jail at Manning.

On January 17th, this defendant and Oscar Whiteman were arraigned upon an information charging them with the crime of murder in the first degree. They were not represented by counsel. Both defendants pleaded guilty. After the pleas were entered the trial judge questioned each of the defendants separately. At such questioning this defendant denied all knowledge of the crime. Samples of the questions and the answers follow.

"Q. Now, the Information charges that on January 1, 1953, you committed the crime of Murder in the First Degree; that you unlawfully and feloniously, with a design to commit rape upon Cynthia Starr, a minor of the age of sixteen years, did hit and strike her over the head and body while in an automobile and that such acts caused her death, and that you dragged her from the car and left her in a ditch by the highway. Are those facts in a general way, true? A. I don't know, sir. I was drunk at the time.

"Q. Fully drunk? A. Yes, sir.

"Q. Now, what happened that caused you to assault Cynthia Starr? A. I don't know, sir. I just don't know.

"Q. Did you hit her with a bottle of wine? A. Well, sir, I heard that story so many times I believe it myself. That's why I signed a statement that way.

"Q. And you signed a statement admitting that you did hit her on the head? A. Yes, sir.

"Q. —with a bottle of wine? A. Yes, sir.

"Q. And what effect did that blow have on her? A. I don't know, sir.

"Q. What did you do with her afterwards? A. I don't know, sir. I was out on my feet, I guess.

"Q. Was Cynthia Starr killed while in the car in which the both of you were riding? A. I wouldn't know, sir. I—if I knew she was lying there I would have told the officers where she was a long time ago."

Throughout the examination this defendant consistently denied all knowledge of the crime to which he had just pleaded guilty and stated that the reason he had signed a statement admitting the crime was because he had heard the story so many times that he believed it himself. That such was his attitude in the office of the state's attorney when he signed the confession is corroborated by the statement made by the state's attorney to the court at the arraignment. At that time Mr. Malloy said: "About Mr. Malnourie, I haven't been able to get

a clear-cut story from him any more than he told the court."

Malnourie states that the confession and plea were secured by repeated beatings and abuse, by long-continued questioning during which he was denied food and sleep, by threats that if he didn't confess, he would be turned over to the mob and be hanged or burned at the stake and by promises of leniency if he did confess. The officers who were in charge of the investigation deny any abuse of Malnourie or any threats or promises made to him except insofar as the incident at the Big Flat School House is concerned. As to that, they say that the abuse there administered and the threats there made were only for the purpose of discovering where Cynthia's body was and that the defendants had previously admitted killing her without being subjected to any duress whatsoever. The record discloses, however, that the only admission made by Malnourie prior to this incident was, as stated in Sheriff Pavlenko's affidavit, an admission, "that she must be dead."

It is also pointed out that seven days elapsed between the signing of the admission of the killing and the plea of guilty, and that therefore if there had been any duress in securing the admission of guilt, such duress would not relate to or vitiate the voluntary character of Malnourie's plea.

█ The affair at the Big Flat School and the subsequent subjection of the defendants to threats of mob violence from a hostile crowd in the City Hall at Halliday are most shameful incidents. They hark back to a medieval theory of the administration of justice in which the rack and hoist were considered proper implements to extract confessions, whether truthful or not, from persons suspected of crime. The officers of the law who had the defendants in charge, particularly the sheriff and his deputy, participated in and permitted these incidents to take place. When police officers physically abuse persons suspected of crime and subject them to threats of mob violence, in public, for the purpose of obtaining evidence of guilt, they cannot expect to be believed when they deny charges that, in private, they used the same means to extract admissions of guilt from the suspects. It is apparent that Sheriff Pavlenko exercised an individual and powerful influence over the defendant Malnourie, because Malnourie refused to sign an admission of guilt until after the sheriff had arranged to talk to him alone. Certainly, the source of this influence was not Malnourie's trust and confidence in a man who admittedly had mistreated him. We think therefore that the record amply sustains this defendant's contention that his confession was obtained by threats and other means of duress.

We think too, that the voluntary character of this defendant's plea of guilty was tainted by the menace of further abuse. In the ordinary course of events, that menace would continue as long as he was in the custody of the officers who had abused and threatened him. That he was persuaded to plead guilty without having actual knowledge of his guilt is evidenced by the statement, "I heard that story so many times that I believe it myself," which he made to the trial court immediately after pleading. It is also corroborated by the state's attorney's statement that he hadn't been able to get any more out of the defendant than he had told the court. In fact this defendant's denial of any knowledge of the crime, after his plea and before sentence, raises a serious question as to whether the plea was not withdrawn before its acceptance by the court. Since however we find that the plea was not voluntarily made, it is unnecessary for us to pass on that question.

█ A plea of guilty, induced by coercion, will not support a judgment of conviction. People v. Schwarz, 201 Cal. 309, 257 P. 71; State v. Poglianich, 43 Idaho 409, 252 P. 177; Nichels v. State, 86 Fla. 208, 98 So. 497, 502, 99 So. 121; State v. Brown, 33 N.M. 98, 263 P. 502. A conviction based upon a plea of guilty which

was induced by coercion violates the due process clause of the Fourteenth Amendment to the Constitution of the United States. Hawk v. Olson, 326 U.S. 271, 66 S.Ct. 116, 90 L.Ed. 61; Smith v. O'Grady, 312 U.S. 329, 61 S.Ct. 572, 85 L.Ed. 859.

It follows that the order of the district court denying this defendant's motion to set aside the judgment of conviction entered in this case and to allow this defendant to withdraw his plea of guilty herein, must be reversed. There is therefore no need for us to inquire into defendant's contention that he was denied the assistance of counsel.

Order reversed.

MORRIS, C. J., and SATHRE and GRIMSON, JJ., concur.

JOHNSON, J., did not participate.