STATE of North Dakota, Plaintiff and
Respondent,

v.

Oscar WHITEMAN, Jr., Defendant and
Appellant.

Cr. 271.

Supreme Court of North Dakota.

Sept. 27, 1956.

Rehearing Denied Dec. 19, 1956.

Strutz, Jansonius & Fleck, Bismarck, for appellant.

Leslie R. Burgum, Atty. Gen., T. H. H. Thoresen, Asst. Atty. Gen., for respondent.

SATHRE, Justice.

This is a criminal action. On January 14, 1953 a criminal complaint was filed in the justice court of William Dawes, Justice of the Peace in and for Dunn County, North Dakota charging the defendants Oscar Whiteman Jr., and Donald Malnourie, jointly with the crime of murder in the first degree between the hours of 6:30 and 8:30 p. m., committed on January 1, 1953 in Dunn County, North Dakota, perpetrated by said defendants in committing or attempting to commit rape upon Cynthia Starr, a minor girl of the age of 16 years, by striking her a blow on the head with a wine bottle, from which blow she died.

Prior to the hearing before the Justice of Peace, each of the said defendants, Oscar Whiteman Jr., and Donald Malnourie had signed a written and sworn confession in which they admitted the crime as charged. These confessions were executed on the 10th day of January 1953. At the hearing before the Justice of the Peace on January 14, 1953 the defendants signed a joint written and sworn confession in which they admitted the crime as charged in the complaint filed in the justice court. Upon said written confession the state's attorney of Dunn County on January 16, 1953, filed an information charging said defendants jointly with the crime of murder in the first degree. Thereafter both defendants were brought before the Hon. Harvey J. Miller, Judge of the District Court of the Sixth Judicial District, at Dickinson, North Dakota, and on the 17th day of January 1953, both defendants entered pleas of guilty of murder in the first degree. After the hearing before said District Court the defendant Donald Malnourie was sentenced to life imprisonment in the state penitentiary on his plea of guilty to murder in the first degree. The defendant Oscar Whiteman Jr., was sentenced to thirty years in the state penitentiary, the court having reduced his plea of guilty to murder in the second degree.

Thereafter both of the defendants moved the trial court to vacate the judgments and sentences entered in their respective cases and allow them to withdraw their pleas of guilty and to enter pleas of not guilty and to defend the actions. The motions to vacate the pleas of both defendants were made upon the grounds that the confessions made by them and upon which the judgment and sentences were entered, were involuntarily made and were obtained through fraud, coercion, deceit, duress, torture, mob violence and other prejudicial acts which destroyed the free will of said defendants, and that said acts were perpetrated and committed upon said defendants by the law enforcement officers of Dunn County, North Dakota on the 9th day of January 1953.

The trial court denied the motions of both defendants for leave to withdraw their pleas of guilty and entered its order accordingly. Both defendants appealed to this court from said order. Said appeals were heard before this court and the decision in the case of State v. Whiteman appears in 67 N.W.2d 599, and the case of State v. Malnourie appears in 67 N.W.2d 330. This court reversed the order of the district court in both cases and granted the defendants the right to withdraw their pleas of guilty and to defend the actions against them in district court.

The defendants moved for a change of venue from Dunn County which motion was granted and the case was tried in the district court of the fourth judicial district, Burleigh County, North Dakota. The defendants were tried jointly to the court and a jury. The jury returned separate verdicts finding each defendant guilty of manslaughter in the first degree and fixed and determined the punishment at imprisonment in the state penitentiary for a period of fifteen years. The defendant Donald Malnourie did not appeal. The defendant Oscar Whiteman Jr., made a

motion for a new trial. The trial court made its order denying the motion and the defendant appealed from said order.

In the specifications of error it is urged that the trial court erred in the following particulars.

"1. That the trial court abused its discretion in denying the motion of defendant Oscar Whiteman for a separate trial.

"2. That the trial court erred in instructing the jury that they could bring in a verdict of lesser offenses than were charged in the state's information charging murder in the first degree.

"3. That the trial court erred in not allowing the defense to cross-examine the state's witnesses on matters the state had not gone into on direct examination.

"4. That the trial court erred in not granting the motion of the defendant Malnourie for a mis-trial on the grounds of improper questioning by counsel for the State, and that such refusal was prejudicial to the defendant Oscar Whiteman Jr.

"5. That the trial court erred in admitting in evidence certain alleged admissions of the defendant Oscar Whiteman Jr. on the ground that they were involuntarily made.

"6. That the verdict of the jury was clearly against the evidence as to the defendant Oscar Whiteman Jr.

"7. That the court erred in not granting the motion for the defendant Oscar Whiteman Jr., directing the jury to bring in a verdict of dismissal of the action as against the said Oscar Whiteman Jr."

We shall discuss these specifications in the order stated.

The appellant Oscar Whiteman Jr., contends that his defense is antagonistic to that of the defendant Donald Malnourie and that he would be prejudiced by a joint trial because evidence would be introduced which would not be admissible against him but would be competent as against his codefendant Donald Malnourie; that confessions or admissions alleged to have been made by the defendant Malnourie and admitted in evidence would prejudice the jury against the appellant and that such prejudice could not be cured by any instructions of the trial court.

Section 29–2107, NDRC 1943 provides that persons jointly accused of crime shall be tried jointly and reads as follows:

"Whenever two or more persons shall be jointly charged with any crime, they shall be tried jointly, subject to the power of the court, in its discretion and for special reasons, to order separate trials as to one or more of the defendants, and when tried jointly there may be joint or several convictions or acquittals, as the jury may determine the facts."

It will be noted under Section 29–2107 persons jointly accused of crime shall be tried together subject to the power of the court, in its discretion and for special reasons to order separate trials as to one or more of the defendants.

In the instant case the two defendants were charged jointly with the crime of murder of Cynthia Starr while attempting to commit rape, under Section 12–2712, NDRC 1943.

The first question to determine is whether or not under the facts and circumstances in the case the trial court abused its discretion in denying defendants' motion for a separate trial.

On the question as to the right to separate trials in criminal cases 23 C.J.S., Criminal Law, § 933, pages 217, 218, and 219 states the rule as follows:

"Unless such privilege is conferred by statute or court rule, as considered

infra this section, defendants jointly indicted are not entitled to a severance or separate trials as a matter of right. Both at common law and under statutes declaratory thereof, the grant or denial of a severance or separate trial to defendants jointly indicted rests in the discretion of the trial court, which, in the absence of good cause therefor may in the exercise of its discretion properly refuse separate trials, and whose grant or denial of a separate trial or severance will be upheld in the absence of an abuse of discretion clearly shown. The court should, however, in passing on an application for a severance exercise a sound discretion, so as to prevent injustice, and should not proceed arbitrarily nor capriciously. What constitutes an abuse of discretion in denying severance or separate trials necessarily depends largely on the whole situation as revealed in each particular case, by the circumstances as disclosed at the time the application for severance was made; and it is not an abuse of discretion to deny separate trials to defendants jointly indicted where a joint trial will result in no substantial injustice, although where the circumstances show that a joint trial would operate to the substantial prejudice of defendant it is an abuse of discretion to deny him a separate trial.

"Under statutes and rules. It is within the province of the legislature to vest the trial court with authority to decide whether there shall be a separate or a joint trial of defendants jointly indicted, and the courts have upheld the validity of statutes regulating the matter of joint or separate trials of defendants jointly indicted."

The state of California has a statute almost identical with Section 29–2107 which has been construed by the supreme court of that state in numerous decisions. In the case of People v. Kaye, 43 Cal.App.2d 802, 111 P.2d 679, 680, it was held that persons alleged to have jointly committed murder and robbery of one person and robbery of another were properly charged with all such crimes in the same indictment. We quote from paragraph 22 of the Syllabus.

"Persons properly charged in same indictment with crimes of murder and robbery of one person and robbery of another, alleged to have been jointly committed by all of such persons, were properly tried jointly. Pen.Code, §§ 954, 1098."

To the same effect is the decision in People v. Baa, 24 Cal.2d 374, 150 P.2d 1, 2. We quote from the opinion:

"There is no inconsistency in granting a defendant a trial separate from some codefendants while requiring a joint trial with others. Section 1098 of the Penal Code provides in part: 'When two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, they must be tried jointly, unless the court order separate trials. In ordering separate trials, the court in its discretion may order a separate trial as to one or more defendants, and a joint trial as to the others, or may order any number of the defendants to be tried at one trial, and any number of the others at different trials, or may order a separate trial for each defendant.' Under the statute, a joint trial is contemplated, and a separate trial is a privilege and not a matter of right. People v. Rocco, 209 Cal. 68, 73, 285 P. 704. * * *

"Furthermore, it does not appear that appellant was prejudiced in any way by having his case tried jointly with that of Jones. At all times appellant had the assistance of his own counsel, his rights were carefully guarded, and evidence relating solely to Jones was restricted by the rulings and instructions of the court."

Likewise in the case of People v. Isby, 30 Cal.2d 879, 186 P.2d 405, 416, the Supreme Court of California said:

"It is not an abuse of discretion to refuse to grant a demand for separate trials because damaging testimony, admissible against one defendant and not against the other, may be received in the case, but it is then incumbent upon the court to limit such evidence in its application to the defendant to whom it is referable. People v. Erno, supra, 195 Cal. 272, 277, 232 P. 710; People v. Perry, 195 Cal. 623, 633, 234 P. 890; People v. Booth, 72 Cal.App. 160, 165, 236 P. 987. As above noted in the recital of the evidence in the forepart of this opinion, defendants' respective rights in this regard were carefully preserved throughout their joint trial."

And in the recent case of People v. Salinas, 1954, 129 Cal.App.2d 565, 277 P.2d 931, 933, it was held:

"Appellant next contends that the court erred in denying his motion for a separate trial. A defendant, jointly charged with another ' "is not entitled to a separate trial as a matter of right, and the question of severance rests entirely in the discretion of the trial court. People v. Burton, 91 Cal.App. 2d 695, 715, 205 P.2d 1065, 1077; People v. King, 30 Cal.App.2d 185, 85 P.2d 928. In the absence of any showing that the trial court abused its discretion in this regard, its ruling will not be disturbed on appeal."

There was testimony introduced at the trial that would apply to one of the defendants but not to the other. The defendants had separate counsel, and when testimony was given which applied to one defendant but not to the other his counsel would make timely objections which were sustained as to such defendant, and in each instance the trial court invariably instructed the jury wholly to disregard the testimony as to the defendant to whom it did not apply. In his final charge to the jury the trial court instructed the jury in this matter as follows:

"Members of the Jury: Some testimony has been received during the trial to be considered by you as to one defendant but not as to the other. The lawyers for the defendants and the Court have cooperated to make this clear and distinct for you throughout the trial, and I now again instruct you to be very careful in this connection and consider such evidence strictly according to the rules announced when it was received."

 Under Section 29–2107, NDRC 1943 and the decisions quoted herein a joint defendant in a criminal action is not entitled to a separate trial as a matter of right. The granting of a separate trial in such cases is largely within the discretion of the trial court and depends upon circumstances from which it is apparent to the court that the ends of justice requires a separate trial. If a trial court refuses to grant a separate trial the refusal will not be set aside by the appellate court unless it is shown that there has been a clear abuse of discretion. It does not appear that the appellant, Whiteman Jr., was prejudiced in any way by having his case tried jointly with Malnourie. He had able counsel who guarded his rights at every stage of the trial. Any evidence relating only to Malnourie was restricted to Malnourie alone under specific ruling and by proper instructions to the jury. We do not believe that under the evidence and circumstances in the case before us that the trial court erred in denying the appellant a separate trial.

 It is next contended that the trial court erred in instructing the jury that they could return verdicts of lesser offenses than that charged in the information.

In his instructions to the jury the trial judge gave the statutory definitions of murder in the first degree and murder in the second degree; manslaughter in the first degree and manslaughter in the second degree.

The defendant Whiteman requested an instruction to the effect that the jury was required to find only one of two verdicts,— murder in the first degree or not guilty.

The statutes of this state with reference to lesser offenses included in a major crime are as follows:

Section 12–2721, NDRC 1943 provides that:

"The jurors before whom any person is prosecuted for murder may find such person guilty of manslaughter according to the facts and circumstances disclosed by the evidence."

Section 29–2106 as follows:

"When it appears that a defendant has committed a public offense and there is reasonable ground to doubt in which of two or more degrees he is guilty, he can be convicted of the lowest of such degrees only."

Section 12–0606 as follows:

"Whenever a crime is distinguished into degrees, the jury, if it convicts the defendant, must find the degree of the crime of which he is guilty. Whenever a verdict of guilty is rendered against the accused upon a prosecution for homicide, the jury must find the degree thereof and determine by its verdict the punishment to be inflicted within the limits prescribed by law."

In 23 C.J.S., Criminal Law, § 1289, page 866, is the following statement with reference to reasonable doubt of grade or degree of crime:

"It is proper, and under some statutes it is the duty of the court, to charge that, if the jury believes beyond a reasonable doubt that accused is guilty but have a reasonable doubt as to the degree of his offense, they should give him the benefit of that doubt and convict him of the lower degree. So, where the offense charged has different degrees, and instruction that, if the jury is reasonably doubtful of the proof as to any material allegation of the indictment, accused must be acquitted, is erroneous."

And in 41 C.J.S., Homicide, § 389, it states:

"On a trial for homicide, the court may and must instruct the jury in respect of every grade or degree of homicide, and every lower included offense, or degree of offense of which accused may be convicted under the indictment and the evidence, whether such an instruction is requested or not. With regard to the evidence requisite and sufficient to make instructions concerning different grades, degrees, or offenses necessary and proper, it has been variously held or stated that the court must, in its instructions, cover every grade or degree of homicide which the evidence tends to prove or to show accused guilty of, or which in any reasonable view suggests, or of which there is substantial evidence or evidence naturally suggesting, probable guilt; that different degrees may and must be submitted to the jury where the evidence and circumstances are such that different inferences or conclusions may properly be drawn therefrom as to the degree; that a charge on the various degrees of homicide should be made unless no possible view of the facts would justify any result other than a conviction or acquittal of the crime charged * * *. Also, it has held or stated that an instruction on a lower grade or degree of the offense should be given, although accused's evidence, in support of such lower grade or degree, is uncorroborated, and that although the evidence points so strongly to the guilt of accused in the highest degree as practically to exclude any theory of guilt in a lower degree, and the evidence does not suggest the absence of premeditation, it is still the duty of the

trial court to instruct in reference to all lower degrees of the crime of which there is any reasonable theory of guilt."

In the instant case the trial court charged the jury as follows:

"If the jury finds that a defendant is not guilty either of murder in the first degree or murder in the second degree, then depending upon the facts and circumstances disclosed by the evidence as determined by the Jury, they may find such person guilty of manslaughter. Whenever the Jury finds any person guilty of manslaughter upon a prosecution for murder they must determine by their verdict whether it is manslaughter in the first degree or manslaughter in the second degree."

The question before us is therefore whether the evidence and the record are sufficient to support the verdict of first degree manslaughter as found by the jury.

Dr. Robert Kling, a pathologist testifying for the state, stated that he had performed an autopsy upon the body of Cynthia Starr. The report of the autopsy which he had prepared was introduced in evidence as State's exhibit 9. It is not necessary for the purpose of this opinion to give in detail the doctor's report of the autopsy. We quote the following from his testimony:

"Q. What is your conclusion in your official report as to the cause of death? A. Well, I would like to say this first: And there is that it, of course, would be very valuable to know the extent of injury that may or may not have been present in the brain of this girl because when a person expires with a possibility of brain damage in mind as the cause, I mean if one is thinking of that possibility and wishes to rule it in or out, of course, it is very important and very desirable to actually see that brain under the

microscope so that you can evaluate the damage that is done to it. Unfortunately, of course, we are denied that adjunct or help in this particular case because of the time lag between death and the time the autopsy had been performed. The findings on that account perhaps aren't as conclusive as I would like them to be. I would assume that as I mentioned death occurred over a number of hours, and due to the fact she did die and the fact that these changes were found in the lungs, I stated that the cause of death would be compatible with exposure. Certainly exposure would produce a similar picture with the available data that we have as was presented here, but again the only valid conclusion you could see was that death occurred over a matter of hours. What the particular reason for the death from exposure is, it is very difficult to make out from the autopsy other than the findings that have been produced. Does that clarify it?

"Q. Suppose, Doctor, that a person was hit on the back of the head with a bottle at least partly full of liquid and rendered unconscious, or what you call it, concussion of the brain, then left out in the open, would that condition you found harmonize with such a philosophy—with such a statement of fact? A. It would be compatible with that.

"Q. So that if there was such a thing as a blow on the back of the head that would render the person that was hit unconscious, or what would you call it, I think you say in your report here, brain concussion with resulting unconsciousness? A. If there were, of course, concussion produced by the blow on the head and the individual were in a coma because of it, and then died of exposure, why, of course, the findings would harmonize with that particular set-up.

"Q. Such situation could be very reasonable in your diagnosis although there was no instantaneous death? A. That is true.

"Q. So then, if a person receives a blow particularly in that region of the head, the skull, that would render such person unconscious—is there any distinction between unconsciousness and concussion of the brain? A. A concussion may or may not produce unconsciousness.

"Q. It may or it may not? A. That is correct.

"Q. Now, as to the genital organs, you said they were normal; by that I mean the vagina, etc.; did you find any hymen? A. There was no hymen present.

"Q. The condition that you found the genital organs in on this girl, you say they were not lacerated? A. There was no laceration.

"Q. Does that prove or disprove that there might not have been sexual intercourse? A. No, sir.

"Q. Could there have been? A. There could—there may or may not have been, that is right.

"Q. There is nothing conclusive about the condition of the genital organs whether or not there had been any sexual intercourse? A. No, sir."

Oscar Whiteman testified in his own behalf substantially as follows:

On January 1, 1953 he was at the home of his brother-in-law Dick Demaray, Halliday, North Dakota. Donald Malnourie got there about 6:30 or 6:45. He had a conversation with Malnourie about a drink. He went out with Malnourie and they went to a car occupied by Cynthia Starr, and John Starr her father. Cynthia was at the wheel because she was the only one who had a driver's license. John Starr was in the back seat and Whiteman and Malnourie

got in the front seat with Cynthia. They had a couple of drinks. Whiteman got out of the car and got a bottle of wine, and they then drove north of Halliday about half a mile. Cynthia and Malnourie got into an argument as to who should drive the car. They then drove back to Halliday, bought some more wine, then drove north of Halliday about half a mile, stopped at an approach to a farm and Malnourie took the wheel. They then drove south of Halliday about two and one half miles. Whiteman then had to get out of the car, and Malnourie, Cynthia and John Starr drove off and left Whiteman on the road. He said he then walked back to Halliday and arrived there at about 7:30. He claimed that all of these drives, stops and his walk of two and one half miles back to Halliday were done in the short time between 10 minutes to 15 minutes to 7:00 and 7:30. He stated that Cynthia was alive and was in the car when he was left standing on the road; that he never saw Cynthia thereafter.

However, Leo Lesmeister, special deputy sheriff of Dunn County, testifying for the state, stated that on January 8th, 1953, he had a conversation with Oscar Whiteman, Jr., and that Whiteman stated that he was with Donald Malnourie, Cynthia Starr and John Starr on the evening of January 1, 1953. The story he told Lesmeister was in substantial agreement with his story to which he testified at the trial up to the incident where he claimed the parties drove away and left him standing on the road two and one-half miles south of Halliday. Lesmeister further stated that Whiteman told him that they, Cynthia, Malnourie and Whiteman were south of Halliday some distance, Cynthia and Donald were out of the car fighting about who should drive; that Cynthia would not give Donald the car keys, and that he "kept hitting her, and she was crying a lot". Donald finally got the keys away from Cynthia and they put Cynthia back in the front seat between Malnourie and Whiteman. They drove south about six miles more, and Cynthia

got out of the car, and Donald kept on slapping her until Whiteman told Donald to stop it. She came back into the car and they drove on south to the Big Flat School House, and Donald and Cynthia were fighting again and he wanted to have intercourse with her, and that she refused and said she would tell her mother. Donald then hit her in the back of the head with a wine bottle about half full. Whiteman said he thought that Cynthia was dead because "she stretched out and kind of quivered."

Lesmeister further testified that Whiteman told him that this took place about 1,000 feet from the Big Flat School House; that Whiteman and Malnourie then dragged the body, face down, one having hold of each arm, to the Big Flat School House but did not find a good place to leave it, so they took it back to the car, but he could not remember just where they left it. Whiteman further stated that Malnourie took Whiteman back to within two and one-half or three miles from Halliday and he walked back to Halliday, and Malnourie said he was driving to Richardton to catch a freight and get out of the country. The foregoing are the statements to which Lesmeister testified that Oscar Whiteman made to him in the evening of January 8, 1953.

It should be noted here that if these statements were made by Oscar Whiteman Jr. to Lesmeister they were made before the 9th of January 1953 when the alleged abuse of the defendants was committed near the Big Flat School House.

Mr. Lesmeister further stated in his testimony that early in the morning of January 10, 1953, while he was sitting in the meeting room of the fire hall at Halliday where they had the jail, Oscar Whiteman who was in a cell in the jail, called Lesmeister and told him he wished to talk to him. Lesmeister then went into Whiteman's cell, and Whiteman asked Lesmeister if he had a car; Lesmeister asked him what he wanted, and Whiteman said if he, Lesmeister, had a car he could take him to the body of Cynthia

Starr. This was about 4:30 in the morning. Lesmeister, Whiteman and Malnourie and one Otto Raash drove south of Halliday to the Big Flat School House and drove back and forth in the area as directed by Whiteman, but owing to the darkness they were unable to locate the body. They drove back to Halliday, but after daylight the same day they went back to the same area covered previously, as directed by Whiteman. They first found a pair of pants, then a purse and a pencil, and shortly thereafter they found the body of Cynthia Starr. Mr. Lesmeister testified as follows in regard to the place where the body was found:

"Q. Was it (the body) where Whiteman had told you it was to be found? A. Yes, it was right along the same place we were the night before.

"Q. The same morning, early in the morning? A. Yes."

The defendants objected strenuously to the testimony of Leo Lesmeister relative to the statements made to him by the defendant Oscar Whiteman Jr. They contended that under the decisions of this court in State v. Malnourie, 67 N.W.2d 330, and State v. Whiteman, 67 N.W.2d 599, any statements or admissions by either defendant regardless as to when made, were barred by reason of the alleged abuse and inhuman treatment of them at the Big Flat School House on January 9, 1953.

The objection of the defendants to the admission of said statements was argued at length before the trial judge in chambers in the absence of the jury. The trial court overruled the objection and Lesmeister's testimony as to the statements made by Whiteman Jr. was admitted in evidence.

The question under consideration by this court in the Whiteman and Malnourie cases cited by appellant was whether or not the confessions made by Malnourie and Whiteman Jr. on January 10, 1953, the joint confession made by them on January 14, and their pleas of guilty entered in the district

court on January 17, 1953 were involuntary and made and entered as a result of the threats, abuse, mistreatment and torture to which they were subjected by the law enforcement officers who had them in charge.

We held in the Malnourie and Whiteman cases supra, on the showing made that the several confessions and the pleas of guilty made and entered by Malnourie and Whiteman were obtained through the use of threats, abuse, and torture, and accordingly reversed the order of the district court denying their motions for leave to withdraw their pleas of guilty and to enter pleas of not guilty. However our decision in those cases did not bar the state from introducing other competent evidence against them in a regular and orderly trial. There was no attempt in the instant case to introduce or use said confessions and pleas and they were not used for any purpose at the trial.

The defendant Whiteman contends that the trial court erred in admitting in evidence the statements made to Lesmeister on January 8th and January 10th, on the ground that they were obtained by threats and intimidation by Lesmeister; but Lesmeister denies positively that he made threats of any kind and that Whiteman's statements were made freely and voluntarily. The statement made by Whiteman on January 8th was made in the evening before the events alleged to have taken place on January 9th at the Big Flat School House. We have reviewed in detail the testimony of Lesmeister as to the statements made to him by Whiteman on January 8th and January 10th and it is not necessary to restate it here. The question before us is whether under the circumstances said statements were properly submitted to the jury.

In the case of State v. Kerns, 50 N.D. 927, 198 N.W. 698, 700, this Court said:

"A confession is inadmissible unless voluntary. This rule is so well established that it is unnecessary to cite authorities in support thereof. But see 16 C.J. p. 717, and cases cited at note 39. In this case the question of the character of the confession as to whether voluntary or involuntary was passed upon and determined by the trial court. The evidence was conflicting. The question thus became a mixed question of law and fact. We think that it was to be determined by the trial court as any other matter touching the admissibility of evidence. * * * [Numerous citations.] Many courts, however, have held to the contrary. Some have laid down the rule that, where there is a conflict of evidence touching the matter, the issue must be submitted to the jury. See State v. Bennett, 143 Iowa 214, 121 N.W. 1021; State v. Storms, 113 Iowa [385] 392, 85 N.W. 610, 86 Am.St.Rep. 380."

And in the case of State v. Whiteman, supra [67 N.W.2d 605], we said:

"The defendant asserts that any statements or confessions or pleas made by him were made solely by reason of threats, coercion and fear of physical mistreatment. On January 14, 1953, he, together with Malnourie, signed a formal document called a confession, which, however, is in the exact language of the first degree murder charge filed against him and Malnourie, except for a recitation that it was voluntarily given. Once having signed a confession, which we do not believe was freely and voluntarily given, the prisoner still being under the control and influence of the police officers who had allowed him to be subjected to threats and physical violence, and one of whom had made promises to him, it becomes a question of fact whether he was not still dominated at the time by the same influences that resulted in the confession of January 10, 1953. No satisfactory evidence appears to the contrary. The same would be true of the oral plea given in the district court. They could well be calculated

to have been the result of the same influences that brought about the involuntary confession of January 10, 1953, and until satisfactory evidence appears to the contrary, they are presumed to have been induced by the same influences as the original involuntary confession."

In the recent case of State v. Braathen, 77 N.D. 309, 43 N.W.2d 202, this court said:

"Evidence bearing upon whether an admission was made voluntarily or involuntarily may be considered by the jury in determining the weight to be given to the admission. In State v. Gibson, 69 N.D. 70, 284 N.W. 209, 211, in the Syllabus by the Court, we said: 'A "confession", as the term is employed in criminal law, is an acknowledgement in express terms by a person of his guilt of a crime, while an admission is an acknowledgement, direct or implied, of some fact or circumstance which in itself is insufficient to show guilt of a crime, but which is pertinent and tends in connection with the proof of other facts to prove such guilt.

" 'In order to be admissible as evidence in a criminal action, a confession must be freely and voluntarily made.

" 'An admission, not amounting to a confession, need not be proved to have been made freely and voluntarily in order to be admissible in evidence against the accused in a criminal action.' "

In the instant case the trial judge ruled that the question as to whether the statements made by Oscar Whiteman Jr., to Lesmeister were voluntarily made, was a question of fact to be determined by the jury. Under the facts and circumstances in the instant case and the rule laid down in the cases cited the ruling of the trial court was correct.

It is next contended that the court erred in not allowing the defense to cross-examine the state's witness Lynn Amsden on matters the state had not gone into on direct examination. The transcript of the testimony at this point shows clearly that the proposed cross-examination was in regard to matters in no way touched upon in the direct examination of the state's witness.

Mr. Heen counsel for defendant Malnourie was cross-examining one Lynn Amsden a witness for the state. This witness had been permitted to testify, over objection by the state, to some incidents that occurred on January 9th, at or near the Big Flat School House, although no reference whatsoever had been made thereto on direct examination by the state. Mr. Heen asked the following question, "Did you see Malnourie fall to the ground after being struck by Pavlenko ?"

"Mr. Thorsen: I want it understood that the state wants a standing objection to this line of questioning by the defense from a state's witness that has not testified as to any of this matter on direct examination, and that it is improper cross-examination.

"The Court: I think the objection is probably good as to the improper cross-examination. Why don't you make him your own witness?

"Mr. Heen: This is going to credibility, I am asking in each instance 'Did you see'.

"The Court: I don't see how it affects his credibility. I will sustain the objection."

The testimony that counsel sought to elicit from this witness on cross-examination had reference to alleged mistreatment of the defendant Malnourie and not to the appellant Whiteman. It had not been referred to on direct examination by the state. We fail to see that such testimony

could affect the credibility of the witness. It was therefore properly excluded by the trial court.

The next specification is that the court erred in not granting the motion of the defendant Malnourie for a mis-trial because of improper questioning by state's counsel. It appears from the evidence that when Malnourie was shown the body of Cynthia Starr he was asked who killed her and he said "I did". On cross-examination he was questioned as to whether he had retracted his statement that he killed Cynthia Starr. We quote from the record:

"Q. Now, then, you say when you got back to Halliday they took you into Malloy's office and you retracted it? A. Yes, sir.

"Q. And isn't that where you signed a confession—".

The question was asked of the defendant Malnourie and he did not appeal. No prejudice to the appellant Whiteman could result therefrom.

Appellant argues in his brief that the trial court erred in denying his motions for mistrial made on two grounds:

That the press contained a report of the proceedings had before the trial court in chambers and that the same may have come to the knowledge of the jury to the prejudice of the appellant.

That on the opening day of the trial while the jurors were present the two defendants were brought into court handcuffed.

However, these grounds were not included in the specifications of error, are not before us and cannot be considered for the first time on appeal.

The appellant Oscar Whiteman Jr. in making his motion in the trial court for a new trial presented an affidavit in support thereof executed by his codefendant Donald Malnourie. It recites that it was voluntarily made by the affiant without duress, threats, promise of immunity, or by reason of any inducement whatsoever. The affidavit recites that on the evening of January 1, 1953, at a point outside of Halliday known as the "Y" he was driving the car; that he stopped and that Whiteman stepped out, and that he, Malnourie took off and left Whiteman; that John Starr was riding in the back seat; that Cynthia Starr was alive and was not injured in anyway at that time. He further stated that he refused to make any statement as to what happened after he let Whiteman out of the car, except that Whiteman was innocent of the crime of which he was convicted.

In his testimony in his own behalf during the trial of the case he stated positively that he did not remember anything of what happened after he together with Whiteman, Cynthia and John Starr left the Demaray home at Halliday shortly before 7 o'clock January 1, 1953. The first thing he claimed he remembered was that he was walking towards some lights which he discovered were the lights in the city of Richardton. His testimony was in direct conflict with the statements made in his affidavit. They could not both be true. Either his testimony was false or the affidavit was false, and neither would be worthy of belief in absence of corroboration by other credible testimony.

The final question for consideration is whether the evidence is sufficient to support the verdict of the jury finding the defendant Oscar Whiteman Jr. guilty of first degree manslaughter. There is a sharp conflict between the testimony of Whiteman and the testimony of Lesmeister as to what Whiteman told him on January 8th and 10th, 1953. There were several witnesses who testified that Oscar Whiteman Jr. was in Halliday before 7 o'clock in the evening of January 1, 1953. Flora Demaray a sister of Oscar Whiteman testified that Oscar was at her house at 7 o'clock on the evening of January 1, 1953 and that at that time Donald Malnourie called him out, and

that Oscar was back before 8 o'clock that evening and went to a show. Another sister Lois Whiteman and Willis Whiteman a brother of Oscar gave similar testimony. William Klundt, agent for the Occident Lumber Co. at Halliday testified that on the evening of January 1, 1953 at about 7:30 p. m., he was driving on the road one and one-half miles south of Halliday and there he passed Oscar Whiteman Jr. walking north towards Halliday. Mrs. Agnes Holen testified that she was at her home in Halliday on the evening of January 1, 1953; that at twenty minutes to 8 that evening she went to a show. She said the show started before 8 o'clock and that Oscar Whiteman Jr. was there when the show started and that he was sitting right behind her and he stayed until the show was over.

On the other hand M. A. Olson, the undertaker of Dunn Center who was also county coroner testifying for the state stated that he was in Halliday on January 7, 1953 and that at that time he saw the defendant Oscar Whiteman Jr., and Donald Malnourie, and that he talked to both of them. He also talked with them on January 8th, and at that time Mr. Lesmeister also was with them,—that is the four were together, Olson, Lesmeister, Whiteman and Malnourie. At that time Olson asked them, Whiteman and Malnourie if they had killed the girl (referring to Cynthia Starr) and Oscar Whiteman said that "Donald killed the girl."

Olson was then asked by counsel:

"Q. Did Malnourie say anything? A. Then I asked Malnourie and he said 'yes, I killed the girl' ".

Olson was further asked by counsel:

"Q. You are sure this was on the 8th of January, 1953? A. Yes."

Olson stated further that during this conversation with Whiteman and Malnourie, Whiteman said that "Malnourie had hit her several times and that he hit her with a wine bottle."

There is in the record certain other testimony which is corroborative of the story that Whiteman told Lesmeister. Mr. Gilsdorf a practicing physician and surgeon from Dickinson, North Dakota, was called as a witness for the state. He examined the body of Cynthia Starr before the examination by Dr. Kling, and performed what is known as the primary or first autopsy at Dunn Center on January 11, 1953. As to the condition of the body he testified among other things as follows:

"Q. What kind of a body was it, man, woman, or child? It was the body of a young Indian girl. The body was hard, firm, a combination of rigor mortis, freezing, the body was very cold to touch; there was no evidence of broken bones; there were multiple bruises—may we say scratches, most prominent on the lower extremities— that is, feet, knees, thighs; these scratches were multiple, I couldn't estimate how many, running in various directions; there were also some scratches apparent on the sides of the thighs; the abdomen and chest was not informative; there was a little to be seen there that appeared abnormal; there was some abrasions, as we say, scratching about the arms."

According to Lesmeister's testimony Whiteman told him that Malnourie and he dragged the body face down in the ditch. The lower limbs, that is the feet, knees and hips were uncovered; dragging them over the rough surface of the ditch would naturally cause scratches and multiple bruises as testified to by Dr. Gilsdorf. The condition of the body as found by Dr. Gilsdorf would therefore leave a strong inference that Whiteman did make the statements testified to by Lesmeister and that he participated in dragging the body of Cynthia Starr in the ditch.

There is also in the record state's exhibit 11, which was admitted in evidence without objection by either defendant. It purports to be a statement signed by the defendants,

Oscar Whiteman Jr. and Donald Malnourie exonerating John Starr from any responsibility for the death of Cynthia Starr and is as follows:

"We certify that John Star is in the clear to the crime we two committed. John was heavyly under intoxicated liquor and has no hand in it whatever.
"Sign
"Oscar Whiteman Jr.
"Donald Malnourie.
"Witness
"Jack Pavlenko
"John Star"

Jack Pavlenko, the then sheriff of Dunn County, testifying for the state, stated that from the 12th of January, 1953 he had in his custody in the Dunn County jail Oscar Whiteman Jr., Donald Malnourie and John Starr, and that he held them under complaints filed with the justice of the peace. That on either the 13th or the 14th of January 1953, Oscar Whiteman Jr., Donald Malnourie and John Starr were sitting around the table at the entrance of the Dunn County jail and this exhibit was first handed to him at that time by John Starr; that this was the first time he had seen it and it was unsigned. Both Whiteman and Malnourie "was telling me about it; they told me that John Starr did not have anything to do with the crime whatsoever, that he had been sleeping most of the time or was so intoxicated he was laying on the seat and he just didn't have anything to do with it, and they wanted me to get this statement and see if I could get him released."

Pavlenko stated positively that this was the first time he had seen it and that he had had nothing to do with writing of that exhibit. He asked them if they wished to sign it and they signed it in his presence, and he and John Starr then signed it as witnesses to their signatures. He then delivered the exhibit to the State's Attorney of Dunn County.

When exhibit 11, was offered in evidence by the state the trial court made the following inquiry:

"The Court: Is there any objection to the receiving of exhibit 11 in evidence?

"Mr. Strutz: No objection.

"Mr. Heen: No objection.

"The Court: The exhibit will be received".

On cross-examination by the state with reference to exhibit 11, Oscar Whiteman testified as follows:

"Mr. Whiteman, I show you plaintiff's exhibit 11; is that your signature? A. After I was beaten I signed it.

"Q. Where were you when you signed it? A. Manning jail

"Q. About what time was that? A. I don't remember

"Q. Was it quite a while after the 10th of January? A. I don't remember.

"Q. You don't remember that? A. Yes.

"Q. But this is your signature? A. Yes, that is my signature. After I was beaten I signed it."

In the course of this examination he did not state when he was beaten, nor did he name any person who had beaten him. He could not remember anything and seemed to have had a complete lapse of memory as to any matter in connection with exhibit 11, except that he signed it. The exhibit was admitted in evidence without objection by counsel.

There is a direct conflict between the testimony of Lesmeister as to what Whiteman told him on the morning of January 8, 1953 and the testimony of Whiteman at the trial in his own behalf. According to Lesmeister's testimony Whiteman

thought that Cynthia Starr was dead after she was struck by Malnourie with the wine bottle, because after the blow "she stretched out and kind of quivered." The question presented upon the record and the evidence is whether Whiteman was guilty of manslaughter in the first degree as found by the jury.

"Homicide is manslaughter in the first degree in the following cases:

"1. When perpetrated without a design to effect death by a person while engaged in the commission of a misdemeanor;

"2. When perpetrated without a design to effect death; and in a heat of passion, but in a cruel and unusual manner or by means of a dangerous weapon, unless it is committed under such circumstances as constitute excusable or justifiable homicide; and

"3. When perpetrated unnecessarily either while resisting an attempt by the person killed to commit a crime or after such attempt shall have failed."

If Whiteman actually believed that Cynthia Starr was dead when Malnourie and he removed her body from the car, even though she was alive at the time, there could be no design on his part to effect her death. But he nevertheless was guilty of a criminal offense under Sections 23-0607 and 23-0629, NDRC 1943. These sections are parts of Chapter 23-06 of the North Dakota Revised Code of 1943 on the subject to Care and Custody of the Dead.

Section 23-0607 so far as applicable is as follows:

"The body of any person whose death occurs in this state shall not be interred, deposited in a vault or tomb, cremated, *or otherwise disposed of*, until a burial-transit permit shall have been properly issued by the registrar of vital statistics of the registration district in which the death occurred."

Section 23-0629, NDRC 1943 classifies violations of Section 23-0607 as misdemeanors and is as follows:

"Penalty for Violating Provisions Relating to Dissections and General Penalty.

"Every person who violates any provision of this chapter relative to the dissection of dead bodies of human beings, or who makes or procures to be made any dissection of the body of a human being except by authority of law or in pursuance of a permission given in accordance with the provision of this chapter, is guilty of a misdemeanor. Every person who violates any provision of this chapter which is not specifically designated as a misdemeanor or for the violation of which another penalty is not specifically provided is punishable by a fine of not less than five dollars nor more than one hundred dollars."

Under subsection 1 of Section 12-2717 homicide is manslaughter in the first degree "When perpetrated without a design to effect death by a person engaged in the commission of a misdemeanor". If Whiteman believed that Cynthia Starr was dead, and if he participated in removing her body from the car and leaving it in the roadside ditch he was guilty of a misdemeanor under section 23-0607. From the testimony of the pathologist, Dr. Kling, Cynthia Starr died from exposure over a period of hours. Although Whiteman thought she was dead when she was removed from the car, if she actually was alive at that time, her death was the result of the commission of a misdemeanor by Whiteman, and he would be guilty of manslaughter under subsection 1 of section 12-2717 supra.

The jury probably believed that Lesmeister's testimony as to what Whiteman told him was true; that Whiteman and Malnourie both participated in removing Cynthia Starr from the car and leaving her

body in the ditch; that she was alive when left in the ditch and that she died from exposure. The fact that the body was found at or near the spot where Whiteman told Lesmeister it could be found leaves a strong inference that he actually knew where the body was left on the evening of January 1st and that he made the statements as testified to by Lesmeister.

We have carefully considered the lengthy record and all of the evidence. The evidence is conflicting and presented questions of fact which were properly submitted to the jury. The jury found both defendants guilty of manslaughter in the first degree. We think the evidence is sufficient to support the verdict.

The order of the trial court denying the motion of the appellant Oscar Whiteman Jr. for a new trial is affirmed.

BURKE, C. J., and MORRIS, JOHNSON and GRIMSON, JJ., concur.

On Petition for Rehearing.

SATHRE, Judge.

The defendant has presented a lengthy petition for rehearing. All of the points raised were fully considered and disposed of in the opinion upholding defendant's conviction. One of the points raised in the petition is that it was error on the part of the trial court, on objection by the state, to exclude certain testimony sought to be elicited from the state's witness Amsden on cross-examination all of which is set forth in detail in the original opinion. The witness was asked by counsel for Malnourie: "Did you see Malnourie fall to the ground after being struck by Pavlenko?" The state's attorney objected to this testimony on the ground that the witness had not testified "as to any of this matter on direct examination, and that it

is improper cross-examination". The Court sustained the objection on the ground of improper cross-examination. The counsel for Malnourie then stated: "This is going to credibility. I am asking in each instance 'did you see'"? The Court: "I don't see how it affects his credibility. I will sustain the objection". The witness had not at any time stated that he had or had not seen Malnourie fall to the ground. Whether he had answered the question either "yes" or "no", it could be no test of his credibility. Nor could any answer to the question be grounds for impeachment of the witness because no ground had been laid for impeachment. The objection to the testimony sought to be elicited was properly sustained on the ground that it could not affect the credibility of the witness. Furthermore, as we said in the opinion herein, the testimony which counsel sought to elicit from the witness Amsden had reference to mistreatment of Malnourie who was not a party to this appeal.

The defendant contends that if the opinion herein is permitted to stand it unduly restricts the right of cross-examination of state's witnesses by a defendant in a criminal case. No restriction of said rule was intended, nor does the language employed justify such inference. Defendant cites the cases of State v. Hazlett, 14 N.D. 490, 105 N.W. 617, State v. Schmidt, 72 N.D. 719, 10 N.W.2d 868, and State v. Bossart, 62 N.D. 11, 241 N.W. 78, in support of his contention.

We have carefully considered these cases. There is no language in the opinion in the instant case that can legitimately be construed to restrict the rule as announced in the cases cited.

Rehearing denied.

BURKE, C. J., and JOHNSON, GRIMSON and MORRIS, JJ., concur.